**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re:<br><br>INK! COFFEE COMPANY,<br>EIN: 84-1318782<br><br>Debtor. | Case No. 24-13445 KHT<br>Chapter 11, Subchapter V |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO INCUR UNSECURED DEBT OUTSIDE THE ORIDINARY COURSE OF BUSINESS**

Ink! Coffee Company ("Debtor" or "Ink! Coffee"), through its counsel, ONSAGER | FLETCHER | JOHNSON | PALMER, LLC, files this Motion for Entry of Interim and Final Orders Authorizing Debtor to Incur Unsecured Credit Outside the Ordinary Course of Business (this "Motion") as follows:

**JURISDICTION AND VENUE**

1. On June 20, 2024, Debtor filed its voluntary petition for relief under Subchapter V, Chapter 11 of title 11 of the United States Code (the "Petition Date"). Debtor is a debtor-in-possession.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1409. The relief requested in this motion constitutes a core matter pursuant to 28 U.S.C. § 157(b)(2)(A), (M), and (O).

**DEBTOR'S BUSINESS**

4. Ink! Coffee was started in 1994 with a stainless-steel cart at the base of Snowmass Mountain. From 1994 through 2019 Ink! Coffee grew to include a specialty roasting operation and

16 retail locations throughout the Denver metro area and Aspen. In 2019, Ink! Coffee had approximately $4,935,569 in revenues.

5. Through 2019 Ink! Coffee was a thriving and growing business that operated 16 locations, many of which were in office buildings in or near downtown Denver. Ink! Coffee also had locations in Aspen and the RINO neighborhood in Denver. As part of its expansion, in December 2019, Ink! Coffee obtained a nearly $2 million SBA-guaranteed loan.

6. Ink! Coffee currently roasts and sells exceptional coffee and sells locally sourced prepared foods from 4 retail locations in the Dever area: in the Cherry Creek Shopping Center, in the National Jewish Health hospital, in the lobby of 1801 California Street in Denver, and on University Boulevard in the Bonnie Brae neighborhood. Ink! Coffee also maintains an office and roastery where Alpine Coffee roasts all of Ink! Coffee's beans in Aurora, Colorado, under Ink! Coffee's supervision.. Ink! Coffee has 26 full and part-time employees.

7. In 2020, the stay-at-home orders resulting from the COVID-19 pandemic turned off Ink! Coffee's business like a light switch. In the early stages of the pandemic, Ink! Coffee obtained a PPP loan, which was substantially forgiven, and $500,000 worth of Small Business Administration EIDL loans. The pandemic relief loans did not change the reality that the office workers that kept many of Ink! Coffee's retail locations alive did not return to the office. As a result, since 2020, Ink! Coffee was forced to shutter all but 4 of its locations. Since 2020, Ink! Coffee has also reduced expenses and made many efforts to adjust to the current economic climate, including raising its prices and eliminating less profitable menu items.

8. The store closures and expense reductions, however, did not solve all of Ink! Coffee's problems. Since 2020, changes in the local economy, including a massive increase in wages, difficulty finding employees, and substantial increases in the cost of goods, among others,

further squeezed Ink! Coffee's finances. Faced with debt from a 16-store platform and a new economic landscape that appeared to be here to stay, in 2023, Ink! Coffee continued to reduce expenses and undertook a nearly year-long effort to preserve the value of its business through a going concern sale, investment, or other transaction that would enable Ink! Coffee to meet its financial obligations.

9. In 2023 and early 2024, Ink! Coffee took out three merchant cash advance loans in anticipation of finding a transaction or longer-term capital source to enable it to service its debt and fund continued operations. The merchant cash advance lenders automatically withdrew approximately $10,000 per week from Ink! Coffee's bank account, which intensified pressure on Ink! Coffee's finances.

10. After the year of marketing efforts, Ink! Coffee, in consultation with its financial advisor and marketing consultant, r2 advisors llc, was able to identify only one party interested in a potential transaction. That party made an offer to purchase substantially all of Ink! Coffee's assets. Ink! Coffee approached its senior secured lender about the transaction and how to accomplish it. Ink! Coffee is informed while the lender was not necessarily opposed to the transaction, it was not in a position to consent or facilitate the transaction through a foreclosure sale of Ink! Coffee's assets. Ink! Coffee filed this bankruptcy case to consummate the potential sale for the benefit of its creditors.

11. On the Petition Date, Debtor filed its Motion Seeking Expedited Entry of First Day Orders Pursuant to L.B.R. 2081-11(a) and Notice of Impending Hearing Thereon (the "First Day Motion"). Attached as Exhibit 2 to the First Day Motion is the Declaration of Keith "Herbie" Herbet (the "Declaration"), which is referenced and incorporated herein. The Declaration sets forth additional background regarding Debtor, the Ink! Coffee locations, Debtor's financial

position, and the events leading to this bankruptcy filing. In addition, the Declaration supports the relief requested in this Motion.

## THE LEEVERS UNSECURED LOAN

12. Ink! Coffee has approximately 50 vendors that supply everything from unroasted coffee beans, other ingredients for coffee drinks, tea, prepared food and beverage products, cups, paper, linens, and necessary services. Ink! Coffee gets deliveries of goods to each store from individual vendors, the schedules for which ranges from once per week for many items to quarterly for less used items. Ink! Coffee is largely on a cash-on-delivery basis for its goods vendors. Ink! Coffee has paid its vendors with various credit cards near or at the time of delivery of goods from vendors. Debtor is in immediate need of access to unencumbered cash to continue to pay its vendors for post-petition goods.

13. Prior to the start of this bankruptcy case, Ink! Coffee has received cash infusions in the form of unsecured loans from Chris Leevers totaling $155,000, which were not repaid. No written agreement exists for these loans. Mr. Leevers is the party interested in purchasing Ink! Coffee's assets. Mr. Leevers also owns the entity that operates the roasting facility that Ink! Coffee pays to roast its coffee beans. Mr. Leevers continues to be interested in purchasing Ink! Coffee's assets and assuming Ink! Coffee's leased locations.

14. Mr. Leevers has agreed to advance up to $48,000 in additional unsecured credit during this case, by permitting Ink! Coffee to use one of his credit cards to pay Ink! Coffee vendors for goods delivered after the bankruptcy case was commenced with Ink! Coffee to repay Mr. Leevers the principal amount used for those vendors as it is able, with the goal of paying on a weekly basis, with no interest (the "Leevers Unsecured Loan"). For the first three weeks of the Budget, Ink! Coffee will not be required to promptly repay the amounts advanced or charged on

the credit card. In weeks 4 and after of the Budget, Ink! Coffee will promptly repay the amounts charged on the credit card. Ink! Coffee is also negotiating a secured, debtor-in-possession loan, for which Ink! Coffee will seek bankruptcy court approval once finalized. The use of funds will be governed by the Budget attached as **Exhibit 1**.

### REQUEST FOR EXPEDITED RELIEF

15. Debtor has an immediate need for access to unencumbered cash to fund its business. If Debtor is unable to incur unsecured credit, it will be unable to continue business, it will lose the going concern value of business, and the liquidation value of its assets at any potential sale will be substantially diminished. Therefore, Debtor will suffer immediate and irreparable harm if not permitted to incur unsecured debt to fund ongoing operations on an expedited basis.

16. Debtor asserts it will have sufficient cash and projected revenues to fund its operations and pay the expenses identified in the Budget until it consummates the potential sale.[1]

17. By separate motion, Debtor has requested that the Court set an expedited preliminary hearing pursuant to Rule 4001(b) (the "Expedited Motion") to consider, among other relief, an interim order permitting Debtor to incur unsecured credit by using Mr. Leevers' credit card. Debtor will serve notice of this Motion as required by Fed. R. Bankr. P. 4001(b)(1)(C) in the manner specified in L.B.R. 2081-1(b).

### SUMMARY OF THE TERMS OF THE UNSECURED LINE OF CREDIT

18. Pursuant to L.B.R. 4001-2(a), the following is a summary of the terms contained in the proposed orders authorizing Debtor to incur unsecured credit, copies of which are attached as

---

[1] Debtor has requested authority to use cash collateral by separate motion.

**Exhibit 2** (proposed interim order) and **Exhibit 3** (proposed final order):

| | |
|---|---|
| **Maximum Borrowing:** | $48,000 |
| **Interim Borrowing:** | $48,000 |
| **Borrowing conditions:** | N/A |
| **Interest Rate:** | None |
| **Fees, costs and charges:** | None |
| **Maturity** | N/A |
| **Events of Default**: | N/A |
| **Remedies on Default** | N/A |
| **Use of Funds Limitation:** | N/A |
| **Protections under § 363** | N/A |
| **Line Item Budget** | Attached as **Exhibit 1** |
| **Provisions Described in L.B.R. 4001-2(a)(2)** | N/A |

## ARGUMENT AND AUTHORITY

19. Section 364(b) provides, in relevant part, that after notice and a hearing, the Court may allow a debtor to obtain unsecured credit or incur unsecured debt outside of the ordinary course of business allowable as an administrative expense under 11 U.S.C. § 503(b)(1). 11 U.S.C. § 364(b).

20. Debtor has an immediate need for access to unencumbered funds to pay its vendors, who require Debtor to pay up front or on delivery. Debtor and the estate will realize significant benefits from the Leevers Unsecured Loan, which will enable Debtor to pay, to the extent cash collateral is insufficient, certain vendors that will not deliver goods to Debtor without up front payment. Debtor anticipates that if this Motion is not approved, it will be unable to continue business, it will lose the going concern value of business, and the liquidation value of its assets at any potential sale will be substantially diminished. Therefore, Debtor will suffer immediate and irreparable harm if not permitted to incur unsecured debt to fund ongoing operations on an expedited basis.

21. Debtor's business judgment is entitled to deference. *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.,* 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.,*

47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court"); *In re Lifeguard Indus., Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of loan proceeds unless its decision is arbitrary and capricious. *See In re Curlew Valley Assocs.,* 14 B.R. 507, 511-13 (Bankr. D. Utah 1981).

**WHEREFORE**, Debtor requests that the Court: (a) enter an order approving the Leevers Unsecured Loan substantially in the form attached as **Exhibit 1** on a preliminary basis pending a final hearing; (b) set a final hearing to consider approval of the Leevers Unsecured Loan on a final basis; and (c) grant such other relief as the Court deems proper.

Dated: June 24, 2024                              Respectfully submitted,

**ONSAGER | FLETCHER | JOHNSON | PALMER LLC**

*s/ Andrew D. Johnson*
   Andrew D. Johnson, #36879
   Gabrielle G. Palmer, #48948
600 17th Street, Suite 425 North
Denver, Colorado 80202
Ph: (720) 457-7061
ajohnson@OFJlaw.com
gpalmer@OFJlaw.com

*Attorneys for Ink! Coffee Company*