**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re:<br><br>INK! COFFEE COMPANY,<br>EIN: 84-1318782<br><br>                Debtor. | )<br>)<br>)   Case No. 24-13445 KHT<br>)   Chapter 11, Subchapter V<br>)<br>)<br>) |

**MOTION SEEKING EXPEDITED ENTRY OF FIRST DAY ORDERS PURSUANT TO L.B.R. 2081-1(a) AND NOTICE OF IMPENDING HEARING THEREON**

Ink! Coffee Company ("Debtor"), through its counsel, ONSAGER | FLETCHER | JOHNSON | PALMER, LLC, files this Motion Seeking Expedited Entry of First Day Orders Pursuant to L.B.R. 2081-1(a) and Notice of Impending Hearing Theron(this "Motion") as follows:

## INTRODUCTION

1. On June 20, 2024, Debtor filed its voluntary petition for relief under subchapter V, Chapter 11 of title 11 of the United States Code (the "Petition Date"). Debtor is a debtor-in-possession.

2. Concurrently herewith, Debtor filed the following separate motions (each a "First Day Motion" and together the "First Day Motions"):

    a. Motion for Entry of (I) Interim Order Authorizing Use of Cash Collateral; (II) Final Order Authorizing Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Setting a Final Hearing on Use of Cash Collateral; and (V) Granting Related Relief (the "Cash Collateral Motion");

    b. Motion for Entry of Order (I) Authorizing Debtor to (a) Pay Prepetition Employee Wages, Salaries and Other Compensation and (B) Continue Employee Benefit Programs; and (III) For Related Relief (the "Prepetition Wages Motion");

    c. Motion for Entry of Order Authorizing Debtor to: Continue Customer Practices, Including Honoring Prepetition Gift Cards, Customer Programs

and Refund Policy; and (b) Sell Gift Cards Postpetition (the "<u>Customer Practices Motion</u>"); and

d. Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor to Incur Unsecured Debt Outside the Ordinary Course of Business (the "<u>Unsecured Credit Motion</u>").

3. Pursuant to Local Rule 2081-1, Debtor seeks the entry of the following interim and final orders (the "<u>First Day Orders</u>"), copies of which are attached hereto as **Exhibit 1**, granting the First Day Motions on an expedited basis:

a. Order Authorizing Debtor to (A) Pay Prepetition Wages, Salaries, and Other Compensation; (B) Continue Employee Benefit Programs; and (C) For Related Relief;

b. Interim Order Authorizing Use of Cash Collateral;

c. Order Authorizing Debtor to Continue Customer Practices, Including Honoring Prepetition Gift Cards, Customer Programs and Refund Policy; and (b) Sell Gift Cards Postpetition; and

d. Interim Order Granting Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor to Incur Unsecured Debt Outside the Ordinary Course of Business.

4. A proposed order granting each First Day Motion is also attached to the applicable First Day Motion. Each First Day Motion, the relief requested in each First Day Motion, and the bases for expedited entry of the First Day Orders is discussed below and in the Declaration of Keith "Herbie" Herbet, Debtor's President (the "<u>Declaration</u>"), a copy of which is attached as **Exhibit 2**. The Declaration is incorporated in this Motion and each First Day Motion.

5. Debtor certifies that the relief requested herein is needed on an expedited basis to avoid immediate and irreparable harm to Debtor's estate, to ensure uninterrupted company operations, and to preserve the Debtor's estate. Debtor believes the relief requested is in the best interests of Debtor's estate, its creditors, and employees. The relief requested in each First Day Motion is separately identified and discussed as required under Local Rule 2081-1.

**BACKGROUND**

6. Debtor owns and operates Ink! Coffee, which is a specialty coffee shop in the Denver metropolitan area. Ink! Coffee roasts and sells exceptional coffee and also sells locally-sourced prepared foods from 4 retail locations in the Dever area: in the Cherry Creek Shopping Center, in the National Jewish Health hospital, in the lobby of 1801 California Street in Denver, and on University Boulevard in the Bonnie Brae neighborhood. Ink! Coffee also maintains an office and roastery where Alpine Coffee roasts all of Ink! Coffee's beans in Aurora, Colorado, under Ink! Coffee's supervision. Ink! Coffee has 26 full and part-time employees.

7. Through 2019 Ink! Coffee was a thriving and growing business that operated 16 locations, many of which were located in office buildings in or near downtown Denver. Ink! Coffee also had locations in Aspen and the RINO neighborhood in Denver. As part of its expansion, in December 2019, Ink! Coffee obtained a nearly $2 million SBA-guaranteed loan.

8. In 2020, the stay-at-home orders resulting from the COVID-19 pandemic turned off Ink! Coffee's business like a light switch. In the early stages of the pandemic, Ink! Coffee obtained a PPP loan, which was substantially forgiven, and $500,000 worth of EIDL loans. While the pandemic relief loans helped, they did not change the reality that the office workers that kept many of Ink! Coffee's retail locations alive did not return to the office. As a result, since 2020, Ink! Coffee was forced to shutter all but 4 of its locations. Since 2020, Ink! Coffee has also reduced expenses and made many efforts to adjust to the current economic climate, including raising its prices and eliminating less profitable menu items.

9. The store closures and expense reductions, however, did not solve all of Ink! Coffee's problems. Since 2020, changes in the local economy, including a massive increase in wages, difficulty finding employees, and substantial increases in the cost of goods, among others,

further squeezed Ink! Coffee's finances. Faced with debt from a 16-store platform and a new economic landscape that appeared to be here to stay, in 2023, Ink! Coffee continued to reduce expenses and undertook a nearly year-long effort to preserve the value of its business through a going concern sale, investment, or other transaction that would enable Ink! Coffee to meet its financial obligations.

10. In 2023 and early 2024, Ink! Coffee took out three merchant cash advance loans in anticipation of finding a transaction or longer-term capital source to enable it to service its debt and fund continued operations. The merchant cash advance lenders automatically withdrew approximately $10,000 per week from Ink! Coffee's bank account, which intensified pressure on Ink! Coffee's finances.

11. After the year of marketing efforts, Ink! Coffee, in consultation with its financial advisor and marketing consultant, r2 advisors llc, was able to identify only one party interested in a potential transaction. That party made an offer to purchase substantially all of Ink! Coffee's assets. Ink! Coffee approached its senior secured lender about the transaction and how to accomplish it. Ink! Coffee is informed while the lender was not necessarily opposed to the transaction, it was not in a position to consent or facilitate the transaction through a foreclosure sale of Ink! Coffee's assets. Ink! Coffee filed this bankruptcy case to consummate the potential sale for the benefit of its creditors.

12. In order to ensure the continued operation of Debtor's business while Debtor pursues a going concern sale, Debtor requests that the Court approve certain relief on an expedited basis. Further background information is set forth in the Declaration.

**RELIEF SOUGHT ON AN EXPEDITED BASIS**

    A.    **INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL**

13. In the Cash Collateral Motion, Debtor requests entry of interim and final orders (collectively, the "Cash Collateral Orders") (a) authorizing Debtor to use "Cash Collateral," as defined in 11 U.S.C. § 363(a); (b) granting adequate protection to prepetition loan parties; (c) modifying the automatic stay imposed by 11 U.S.C. § 362 to the extent necessary to implement and effectuate the terms of the Cash Collateral Orders and (d) granting related relief.

14. Debtor does not have the means to sustain continued operations without the use of cash in which one or more parties may have an interest. Accordingly, without the ability to immediately use property that may constitute Cash Collateral pursuant to the budget attached to the Declaration, Debtor's operations will be brought to an immediate halt, with damaging consequences for Debtor, the bankruptcy estate and creditors. For example, without the ability to use Cash Collateral, Debtor will be unable to satisfy payroll obligations, lease payments, and other expenses, which may foreclose the possibility of a going concern sale. Accordingly, immediate and irreparable harm would result if the relief requested in the Cash Collateral Motion is not granted on an interim basis pending the final hearing.

    B.    **ORDER AUTHORIZING PAYMENT OF PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS**

15. In the Prepetition Wages Motions, Debtor seeks an Order, pursuant to 11 U.S.C. §§ 105(a), 507(a) and 363(b) and Fed. R. Bankr. P. 6003, authorizing Debtor to (A) pay as due all prepetition wages, salaries and compensation owed to employees as of the Petition Date; (B) pay any and all withholding taxes, including social security, FICA, federal and state income taxes, and employee funded 401(k) contributions, health care payments and other types of withholdings

whether prepetition or subsequent thereto; (C) continue employee benefit programs, and (D) authorizing such further and other related relief is necessary and appropriate.

16. As of Ink! Coffee's June 14, 2024, payroll, Ink! Coffee employed 29 full and part-time employees (the "Employees"), though the precise number varies as the result of turnover. The majority of Ink! Coffee's Employees are paid on an hourly basis. Ink! Coffee has five salaried employees, two of which are insiders (Keith Herbert and John Rose)[1].

17. The Employees are paid bi-weekly, one week in arrears. Ink! Coffee's June 14, 2024 payroll covered the period of May 27, 2024 through June 9, 2024. The aggregate amount of Ink! Coffee's June 14, 2024 payroll was approximately $46,938, of which approximately $2,477 was voluntary employee reductions, $9,620 was for tax deductions from the Employees' gross pay, and $34,841 was net wages, and Ink! Coffee's side of employment taxes. Employee benefits (discussed further below) was $5,077 and the fee owed to Ink! Coffee's payroll processer was $750. Ink! Coffee's prior payroll was approximately the same.

18. Ink! Coffee's next payroll will be June 28, 2024, which covers the time period June 10, 20204, through June 23, 2024. Ink! Coffee's total payroll for each period varies because most of Ink! Coffee's employees are hourly. Certain employees receive tips, all of which are paid to the Employees. The aggregate amount of tips per payroll varies. Ink! Coffee estimates that it will have a presently due payroll obligation to the Employees for the June 28, 2024 payroll in approximately the same amount as Ink! Coffee's June 14, 2024 payroll (the "Wages").

19. Ink! Coffee withholds certain taxes from each Employee's pay and must pay the employer's portion of certain employment taxes in the ordinary course, including FICA/Social Security, Medicare, FUTA, SUTA, COFAMLI, and certain local taxes (the "Employment Taxes").

---

[1] Mr. Herbert owns 35% of the Ink! Coffee's shares and Mr. Rose owns 25% of the Ink! Coffee's shares. Both Mr. Herbert and Mr. Rose are officers and directors of the Ink! Coffee and are referred to as the "Insiders."

20. Ink! Coffee uses Automatic Data Processing ("ADP") as its payroll processing service. ADP debits Ink! Coffee's account one business day prior to each payroll and pays Employees directly following Ink! Coffee's payroll remittance to ADP.

21. As of the Petition Date, there are no Employees, including the Insiders who are owed in excess of $15,150[2] for Wages.

22. Ink! Coffee offers its Employees a number of benefits (collectively, the "Benefits"). The Benefits are as follows:

    a. eligibility to participate in Ink! Coffee's 401(k) plan, for which Ink! Coffee does not provide any matching contributions. Debtor's monthly fee to maintain the 401(k) plan is approximately $750.00;

    b. eligibility for Employees and their families to participate in medical and prescription coverage under a plan administered through United Healthcare ("UHC");

    c. a dental benefit through UHC;

    d. a vision insurance plan administered through UHC; and

    e. life insurance administered through UHC.

For any employee that participates in Ink! Coffee's group health, dental, life insurance and/or vision plan through UHC, Ink! Coffee pays a portion of the Employee's premium.

23. Ink! Coffee's salaried Employees are eligible to receive sick pay, paid time off days and vacation days (the "PTO"). The amount of PTO varies based on each Employee's role with the company. Five employees currently have accrued PTO, one of which has 10 days accrued and the other four of which have 9 days accrued. None of the employees with accrued PTO are Insiders.

---

[2] I am informed this is the current limit for a priority claim under 11 U.S.C. § 507(a)(4).

24. In the aggregate, Ink! Coffee's monthly cost of the Benefits is approximately $7,000, the bulk of which is for health insurance, dental, and vision premiums. Employees that choose to participate in the health insurance benefit have an amount deducted from each paycheck based on the number of hours the Employee worked and who in the Employee's family is covered by the benefit. Ink! Coffee pays the UHC premiums shortly after the month for which the premium applies, meaning the June 2024 UHC premium has already been paid.

25. Most Ink! Coffee employees are hourly and the number of hours worked varies by pay period. However, Ink! Coffee's payroll is quite consistent from pay period to pay period. Attached to the Declaration is a schedule of the wages and benefits owed to Ink! Coffee employees for the prior pay period.[3] As shown, no Employee was owed or earned Wages and Benefits in excess of the $15,150 cap (less the amount paid for priority wages under 11 U.S.C. § 507(a)(4)) or priority benefits claims contained in 11 U.S.C. § 507(a)(5). Debtor anticipates the payroll for June 28, 2024, to be substantially the same.

26. The Benefits that Debtor seeks to pay in the ordinary course of business would be entitled to priority under 11 U.S.C. § 507(a)(5).

27. The Taxes Debtor will owe for the Wages would be entitled to priority under 11 U.S.C. § 507(a)(8).

28. The Wages, Benefits, and Taxes Debtor will owe postpetition for prepetition debts are collectively referred to as the "Employee Claims."

---

[3] Ink! Coffee customers often tip. These tips are paid directly to the applicable employees without deduction or offset. Tips paid by credit card are paid to employees through the ADP payroll. I am informed the tips are not Ink! Coffee property and are therefore excluded from the attached schedule of wages owed and paid.

29. Granting the relief requested with respect to the Employee Claims entitled to priority affects only the timing, not the amount of the payments to be made to Employees, the Benefits providers, and the governmental units for the Taxes.

30. Debor's Employees rely on their wages to support themselves and their families. If Debtor fails to pay its Employees on time, it may result in a substantial hardship to Debtor's Employees, many of whom may leave as a result, which would hinder the possibility of a going concern sale.

31. The relief sought in the Prepetition Wages Motion is necessary to ensure Debtor can retain its Employees, continue to operate without interruption, and proceed with a potential going concern sale. Absent such relief, Debtor would suffer immediate and irreparable harm to the detriment of the Employees, creditors and Debtor's bankruptcy estate.

**C. ORDER AUTHORIZING CONTINUATION OF CUSTOMER PRACTICES INCLUDING HONORING GIFT CARDS AND REFUND POLICY**

32. In the Customer Practices Motion, Debtor seeks an order authorizing Debtor to continue its customer practices and policies, including honoring its prepetition gift cards and its loyalty program, and for authority to sell gift cards post-petition.

33. Prior to the Petition Date and in the ordinary course of Debtor's business, Debtor sold pre-paid gift cards for use towards the purchase of products sold at Ink! Coffee's locations. Debtor estimates that approximately $106,000 worth of unexpired and unredeemed gift cards were outstanding on the Petition Date (the "Prepetition Gift Cards"). Debtor lacks information about the identities of customers who purchased the Prepetition Gift Cards or the persons who may currently hold those Prepetition Gift Cards. As a result, the physical gift card is required for redemption.

34. Also prior to the Petition Date and in the ordinary course of Debtor's business, Debtor offered a loyalty program for its customers (the "Loyalty Program"). There is no cost to

participate in Loyalty Program, which provides for two benefits: (a) for every $50 a Loyalty Program participant spends at one of the Ink! Coffee locations, the customer earns $5 towards a purchase at an Ink! Coffee location, and (b) a free drink on a Loyalty Program participant's birthday. Debtor asserts the Loyalty Program is an essential tool for Debtor's business but has a minimal effect on Debtor's budget.

35. Debtor estimates that gift card redemption and honoring the Loyalty Program costs approximately $100 to $200 per week.

36. Debtor's ability to honor the Prepetition Gift Cards and to continue the Loyalty Program are critical to its ability to attract and retain loyal customers. Debtor believes that if it does not honor the Prepetition Gift Cards and continue the Loyalty Program, it will place Debtor at a disadvantage against its competition. Debtor also believes that a failure to honor the Prepetition Gift Cards and continue the Loyalty Program will negatively impact Debtor's reputation, erode Debtor's customer base and potentially deter new customers, all of which will impair the value of its business.

37. Debtor believes that its creditors will benefit from its ability to honor the Prepetition Gift Cards and Loyalty Program. Debtor's customer base and reputation as a local, independent coffee shop are critical to its ability to generate ongoing revenue and ultimately, the value of its business in any sale or reorganization. Debtor believes that honoring the Prepetition Gift Cards and Loyalty Program will help ensure customer satisfaction and the experience that draws customers to Ink! Coffee.

38. Debtor has determined, in the exercise of its business judgment, that it is necessary and appropriate for it to continue to sell gift cards to its customers on a postpetition basis and to use the funds generated from the postpetition sale of gift cards to fund its ongoing expenses.

39. Debtor asserts that the requested relief is necessary to avoid immediate and irreparable harm. Failing to honor Prepetition Gift Cards and the Loyalty Program is likely to impair Debtor's reputation and the confidence of its customers. Similarly, failing to sell gift cards post-petition is also likely to erode confidence and decrease the visits of customers. Therefore, Debtor believes that it will suffer immediate and irreparable harm if it is unable to honor the Prepetition Gift Cards and Loyalty Program and to continue selling gift cards postpetition.

D. **INTERIM ORDER AUTHORIZING DEBTOR TO INCUR UNSECURED DEBT OUTSIDE THE ORDINARY COURSE OF BUSINESS**

40. In the Unsecured Credit Motion, Debtor requests that the Court authorize it to incur an Unsecured Revolving Lown from Chris Leevers ("Mr. Leevers").

41. Ink! Coffee has approximately 50 vendors that supply everything from unroasted coffee beans, other ingredients for coffee drinks, tea, prepared food and beverage products, cups, paper, linens, and necessary services. Ink! Coffee gets deliveries of goods to each store from individual vendors, the schedules for which ranges from once per week for many items to quarterly for less used items. Ink! Coffee is largely on a cash-on-delivery basis for its goods vendors. Ink! Coffee has paid its vendors with various credit cards near or at the time of delivery of goods from vendors. Ink! Coffee's vendor expenses are consistently approximately $12,000 per week.

42. Prior to the start of this bankruptcy case, Ink! Coffee has received cash infusions in the form of unsecured loans from Chris Leevers totaling $155,000, which were not repaid. No written agreement exists for these loans. Mr. Leevers is the party interested in purchasing Ink! Coffee's assets. Mr. Leevers also owns the entity that operates the roasting facility that Ink! Coffee pays to roast its coffee beans. Mr. Leevers continues to be interested in purchasing Ink! Coffee's assets and assuming Ink! Coffee's leased locations.

43. Mr. Leevers has agreed to advance up to $48,000 in additional unsecured credit during this case, either by cash advance or by permitting Ink! Coffee to use one of his credit cards to pay Ink! Coffee vendors for goods delivered after the bankruptcy case was commenced with Ink! Coffee to repay Mr. Leevers the principal amount used for those vendors as it is able, with the goal of paying on a weekly basis, with no interest. For the first three weeks of the Budget, Ink! Coffee will not be required to promptly repay the amounts advanced or charged on the credit card. In weeks 4 and after of the Budget, Ink! Coffee will promptly repay the amounts advanced or charged on the credit card. Ink! Coffee is also negotiating a secured, debtor-in-possession loan, for which Ink! Coffee will seek bankruptcy court approval once finalized.

44. Debtor has an immediate need for access to unencumbered funds to pay its vendors, who require Debtor to pay up front or on delivery. Debtor and the estate will realize significant benefits from the Leevers Unsecured Revolving Loan, which will enable Debtor to pay certain vendors that will not deliver goods to Debtor without up front payment. Debtor anticipates that if this Motion is not approved, it will be unable to continue business, it will lose the going concern value of business, and the liquidation value of its assets at any potential sale will be substantially diminished. Therefore, Debtor will suffer immediate and irreparable harm if not permitted to incur unsecured debt to fund ongoing operations on an expedited basis.

## NOTICE

45. Pursuant to L.B.R. 2081-1(b)(2), a copy of this Motion, along with the Cover Sheet for Motion Seeking Expedited Entry of Orders and Notice of Impending Hearings Thereon, the Declaration, L.B.F. 2081-1.2 Notice of Filing of Chapter 11 Debtor's Motion Seeking Expedited Entry of Orders, L.B.F. 2081-1.3 Response and Request for Notice of Hearing, and copies of each

of the First Day Orders, will be served by hand delivery, overnight mail, facsimile, or email on: (i) the 20 largest unsecured creditors; (ii) the IRS and other relevant government entities; (iii) all parties who have requested notice; (iv) any party whose interest in property of the estate will be directly affected by the proposed First Day Orders; and (v) the United States Trustee.

46. Pursuant to L.B.R. 2018-1(c)(2), as soon as Debtor is notified of a time and date for a hearing on this Motion and the First Day Motions, Debtor will serve a Notice of Time and Place of Hearing on Debtor's Motion Seeking Expedited Entry of Orders in substantial conformity with L.B.F. 2081-1.4 to all parties who have been or will be served with this Motion and all parties who requested notice in this case or responded to the Motion.

WHEREFORE, for the reasons set forth herein, Debtor respectfully requests that this Court schedule a hearing for expedited consideration for entry of the First Day Orders granting the relief requested in the First Day Motions under L.B.R. 2081-1 and for such other and further relief as the Court deems necessary and appropriate.

Dated: June 24, 2024                    Respectfully submitted,

**ONSAGER | FLETCHER | JOHNSON | PALMER LLC**

*s/ Gabrielle G. Palmer*
    Andrew D. Johnson, #36879
    Gabrielle G. Palmer, #48948
600 17th Street, Suite 425 North
Denver, Colorado 80202
Ph: (720) 457-7061
ajohnson@ofjlaw.com
gpalmer@OFJlaw.com

*Attorneys for Ink! Coffee Company*