**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 24-13445 KHT |
| INK! COFFEE COMPANY, | ) | Chapter 11, Subchapter V |
| EIN: 84-1318782 | ) | |
| | ) | |
| Debtor. | ) | |

**MOTION FOR ORDER AUTHORIZING AND APPROVING: (A) BID PROCEDURES FOR THE GOING CONCERN SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS; (B) NOTICE OF SALE BY AUCTION; (C) THE AUCTION; (D) APPROVING STALKING HORSE BID AND BID PROTECTIONS; AND (E) GRANTING RELATED RELIEF**

Ink! Coffee Company ("Debtor" or "Ink! Coffee"), through its counsel, files this Motion for Order Authorizing and Approving: (A) Bid Procedures for the Going Concern Sale of Substantially All of Debtor's Assets; (B) Notice of Sale by Auction; (C) the Auction; and (D) Stalking Horse Bid and Bid Protections; and (E) Granting Related Relief (this "Bid Procedures Motion") as follows:

**SUMMARY OF RELIEF REQUESTED**

1. Subject to Court approval, Debtor intends to solicit bids for the sale of substantially all of its assets, including inventory, furniture, fixtures, office materials and supplies, tradenames and other intellectual property, goodwill, certain executory contracts and unexpired leases, personal property and other assets (collectively, the "Assets"). Excluded assets include cash, accounts receivable, and other property, all as more specifically set out in the APA (defined below).

2. Debtor and Boria Capital, LLC ("Purchaser" or "Stalking Horse"), have entered into the Asset Purchase Agreement (the "APA") between a copy of which is attached hereto as **Exhibit 1**. A summary of the material terms of the APA is contained in section (E), below. Subject to Court approval and higher bids, the Stalking Horse has agreed to purchase the Assets in exchange for consideration valued at $300,000 (the "Purchase Price"), as follows: (a) cash in the amount of $100,000; (b) the deemed satisfaction, for the benefit of Debtor's estate, of the debt, claims, and security interests arising from the Loan Agreement (defined below) between Debtor and Stalking Horse totaling $164,000; (c) the deemed satisfaction, for the benefit of Debtor's estate, of the unpaid debt or claim arising from the Unsecured Loan from Chris Leevers (defined below) totaling $36,000.

3. Debtor intends to sell the Assets to Stalking Horse, or alternatively, to the highest or otherwise best bidder for the Assets, and requests entry of an Order substantially in the form attached hereto as **Exhibit 2** (the "Bid Procedures Order"), approving:

  a. Buyer protections for the Stalking Horse, including, pursuant to the APA, a break-up fee of $9,000 (the "Break-Up Fee"), plus all reasonable, actual and documented costs and out-of-pocket expenses incurred by Stalking Horse in connection with the negotiation, preparation, execution and entry of the APA and the transactions contemplated thereby, in an amount not to exceed $5,000 (the "Expense Reimbursement" and with the Break-Up Fee are the "Stalking Horse Protections");

  b. The Bid Procedures attached hereto as **Exhibit 3**;

  c. The form and manner of the Sale Notice attached as **Exhibit 4**; and

  d. A public auction to conduct a sale of the Assets, as necessary.

## SUMMARY OF THE PROPOSED SALE PROCESS

4. Subject to approval of the Bid Procedures, Debtor shall file and serve a Notice of Sale by Auction (the "Sale Notice") in substantially the same form as is attached hereto as **Exhibit 4** no later than two business days after the date the Court enters an Order approving this Motion. The purpose of the Sale Notice is to provide all interested parties of timely and proper notice of: (i) the proposed sale of the Assets, including the date and time of the Auction (if one is held); and (ii) the Bid Procedures. Debtor anticipates consummating the proposed sale through its Subchapter V Plan, which it will file no later than September 18, 2024.[1]

5. An auction (if one is held as the result of Debtor receiving more than one Qualified Bids, as defined below) (the "Auction") will be scheduled to occur on October 4, 2024, or at such other date as determined by Debtor, in its sole discretion.

6. Following the conclusion of the Auction and no later than October 7, 2024, Debtor shall file a Notice of Auction Results with the Bankruptcy Court. The purpose of the Notice of Auction Results is to notify creditors and interested parties of the Successful Bidder at the Auction, which Successful Bidder will be obligated to close the transaction contemplated by the APA or Modified APA, as applicable, pursuant to any confirmed chapter 11 plan.

7. Any closing for the sale of the Assets (the "Closing") is targeted to occur by October 31, 2024. A Sale is conditioned on various events, including Court approval of this Motion

---

[1] As explained further below, Debtor, in consultation with and with the assistance of its financial advisor and marketing consultant, undertook a year-long marketing process to search for a party interested in a transaction or longer-term capital source to enable Debtor to service its substantial secured debt and fund continued operations. Debtor identified only one party interested in a potential transaction—the Stalking Horse—and the Purchase Price is substantially less than the outstanding amount of Debtor's secured debt. As a result, Debtor intends to pursue the sale of its Assets (and the assumption and assignment of executory contracts and unexpired leases) through a chapter 11 plan and not a motion to sell pursuant to 11 U.S.C. § 363(f).

2

and confirmation of a chapter 11 plan that provides for the sale of the Assets, including the assumption and assignment of certain executory contracts and unexpired leases, to Stalking Horse or the Successful Bidder, as applicable.

## JURISDICTION AND VENUE

8. On June 20, 2024, Debtor filed its voluntary petition for relief under Subchapter V, Chapter 11 of title 11 of the United States Code (the "Petition Date"). Debtor is a debtor-in-possession.

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1409. The relief requested in this motion constitutes a core matter pursuant to 28 U.S.C. § 157(b)(2)(A), (M), and (O).

## DEBTOR'S BUSINESS AND EVENTS LEADING TO BANKRUPTCY

11. Debtor was started in 1994 with a stainless-steel cart at the base of Snowmass Mountain. From 1994 through 2019 Debtor grew to include a specialty roasting operation and 16 retail locations throughout the Denver metro area and Aspen. In 2019, Debtor had approximately $4,935,569 in revenues.

12. Through 2019 Debtor was a thriving and growing business that operated 16 locations, many of which were located in office buildings in or near downtown Denver. Debtor also had locations in Aspen and the RiNO neighborhood in Denver. As part of its expansion, in December 2019, Debtor obtained a nearly $2 million SBA-guaranteed loan.

13. Debtor currently roasts and sells exceptional coffee and sells locally sourced prepared foods from 4 retail locations in the Dever area: in the Cherry Creek Shopping Center, in the National Jewish Health hospital, in the lobby of 1801 California Street in Denver, and on University Boulevard in the Bonnie Brae neighborhood. Ink! Coffee also maintains an office and roastery where Alpine Coffee roasts all of Ink! Coffee's beans in Aurora, Colorado, under Ink! Coffee's supervision. Debtor has 26 full and part-time employees.

14. In 2020, the stay-at-home orders resulting from the COVID-19 pandemic turned off Debtor's business like a light switch. In the early stages of the pandemic, Debtor obtained a PPP loan, which was substantially forgiven, and $500,000 worth of Small Business Administration EIDL loans. The pandemic relief loans did not change the reality that the office workers that kept many of Debtor's retail locations alive did not return to the office. As a result, since 2020, Debtor was forced to shutter all but 4 of its locations. Since 2020, Debtor has also reduced expenses and made many efforts to adjust to the current economic climate, including raising its prices and eliminating less profitable menu items.

15. The store closures and expense reductions, however, did not solve all of Debtor's problems. Since 2020, changes in the local economy, including a massive increase in wages,

3

difficulty finding employees, and substantial increases in the cost of goods, among others, further squeezed Ink! Coffee's finances. Faced with debt from a 16-store platform and a new economic landscape that appeared to be here to stay, in 2023, Debtor continued to reduce expenses and undertook a nearly year-long effort to preserve the value of its business through a going concern sale, investment, or other transaction that would enable Debtor to meet its financial obligations. Debtor used the services of r$^2$ advisors llc ("r$^2$") to act as Debtor's financial advisor and to assist it in its marketing efforts.

16. In 2023 and early 2024, Debtor took out three merchant cash advance loans in anticipation of finding a transaction or longer-term capital source to enable it to service its debt and fund continued operations. The merchant cash advance lenders automatically withdrew approximately $10,000 per week from Debtor's bank account, which intensified pressure on Debtor's finances.

## POSTPETITION LOANS

17. Mr. Leevers is the principal of Stalking Horse. Prior to the Petition Date, Debtor received cash infusions in the form of unsecured loans from Mr. Leevers totaling $155,000, which have not been repaid.

18. After the Petition Date, Mr. Leevers agreed to advance up to $48,000[2] in additional unsecured credit during the case by permitting Debtor to use one of his credit cards to pay vendors for goods delivered postpetition, with Debtor to repay Mr. Leevers the principal amount used for those vendors as it is able, with the goal of paying on a weekly basis, with no interest (the "Leevers Unsecured Loan"). The Leevers Unsecured Loan was approved by the Court on an interim [Docket No. 40] and final basis [Docket No. 76].

19. In addition to the Leevers Unsecured Loan, Debtor and Stalking Horse have entered into a Loan Agreement for a loan by Stalking Horse to Debtor in the amount of $164,000 to fund Debtor's working capital needs during this case (the "DIP Loan"). Debtor will promptly file motion to approve the DIP Loan with the Court. If approved, the DIP Loan will be a secured (but not priming), multiple-draw term loan.

## MARKETING EFFORTS

20. In April 2023, Debtor approached r$^2$ to discuss how r$^2$ may be able to help Debtor preserve the value of its business through a transaction or longer-term capital source to enable it to service its debt and fund continued operations. From the time of Debtor and r$^2$'s initial meeting in April 2023 through June 2023, r$^2$ reviewed information regarding Debtor and developed marketing materials, including a pitch deck. r$^2$ also prepared a list of 89 prospects who r$^2$ believed may be interested in exploring the possibility of a financial transaction with Debtor, including

---

[2] Debtor notes that the unsecured credit was in the form of using Mr. Leevers' credit card for $12,000 per week of Ink! Coffee business expenses. Ink! Coffee was not required to promptly repay the first 3 weeks of the use of the credit card, while for weeks 4 and after, Ink! Coffee would repay the expenses purchased with the credit card. Thus, the $36,000 in value attributed to the deemed satisfaction of the administrative expense for the unsecured credit is for the first 3 weeks' use that Ink! Coffee anticipates will remain unpaid upon confirmation of a plan.

existing market participants, competitors, and others. In June 2023, $r^2$ began active marketing efforts, including contacting each of the 89 prospects $r^2$ identified. $r^2$ made contact with 37 of its potential prospects, 9 of whom ultimately signed nondisclosure agreements.

21. After the year of marketing efforts and discussions with potential interested parties, Debtor and $r^2$ identified only one party willing to consummate a potential transaction: Mr. Leevers. Mr. Leevers made an offer to purchase substantially all of Debtor's assets. Debtor approached its senior secured lender about the transaction and how to accomplish it. Debtor is informed that while the lender was not necessarily opposed to the transaction, it was not in a position to consent or facilitate the transaction through a foreclosure sale of Debtor's assets. Debtor filed this bankruptcy case to consummate the potential sale for the benefit of its creditors through a chapter 11 plan.

22. With Court approval, Debtor employed $r^2$ in this case as its financial advisor and marketing consultant. To market the Assets prior to an Auction, $r^2$ commenced re-contacting the parties it previously contacted and any parties who have reached out to Debtor or its professionals expressing an interest in potentially acquiring Debtor's assets.

23. Debtor notes the proposed timeline below is intended to preserve as much value for the estate from the proceeds of the proposed sale as possible. A portion of the $300,000 value of the purchase price of the stalking horse bid is attributed to the deemed satisfaction of a debtor in possession secured (but not priming) loan totaling $164,000 for which Debtor is separately seeking approval. Given Debtor's need for financing to maintain a going concern, the shorter the time period prior to closing a sale, the more value will remain for the estate.

24. Given the recent and comprehensive marketing effort, Debtor asserts the proposed marketing and sale timeline below is in the best interests of the estate.

## RELIEF REQUESTED

25. By this Motion, Debtor requests entry of an Order substantially in the form attached hereto as **Exhibit 2** (the "Bid Procedures Order") approving:

    a. Buyer protections for Stalking Horse, including, pursuant to the APA, a break-up fee of $9,000 (the "Break-Up Fee"), plus all reasonable, actual and documented costs and out-of-pocket expenses incurred by Stalking Horse in connection with the negotiation, preparation, execution and entry of the APA and the transactions contemplated thereby, in an amount not to exceed $5,000 (the "Expense Reimbursement");

    b. The Bid Procedures attached hereto as **Exhibit 3**;

    c. The form and manner of the Sale Notice attached as **Exhibit 4**; and

    d. A public auction to conduct a sale of the Assets.

A. **Summary of Important Dates**

26. The following is a summary of certain dates set forth in the Bid Procedures:

| Sale Notice | 2 days after Court approval of the Bid Procedures |
|---|---|
| Bid Deadline | September 30, 2024 at 5:00 p.m. MDT |
| Auction Notice | October 2, 2024 |
| Auction | October 4, 2024 at 10:00 a.m. MDT |
| Notice of Auction Results | October 7, 2024 |
| Closing | No later than October 31, 2024 |

B. **Summary of the Bid Procedures**

27. Pursuant to L.B.R. 6004-1(f), the following is a summary of the proposed Bid Procedures, all as set forth more fully in section (C), below:

| Provisions to be Highlighted Pursuant to L.B.R. 6004-1(f) | Applicable Section(s) of Bid Procedures |
|---|---|
| **Qualification of Bidders**: demonstration of financial ability close; acknowledgment of no warrantees or representations; entity authorizations | 5; 8 |
| **Qualified Bids**: due September 30, 2024; signed Modified APA with blacklined version; deposit of 10%; initial bid no less than $334,000 | 5; 8 |
| **Bid Protections**: $9,000 break-up fee and $5,000 expense reimbursement, which the Stalking Horse Bidder can credit bid at any Auction | 1.4 (*see also* APA 6.1) |
| **Credit Bids**: Secured Creditors may credit bid as permitted in 11 U.S.C. § 363(k) | |
| **Modification of Bidding and Auction Procedures**: Debtor reserves the right to modify in its reasonable discretion | 1.7; 1.8; 10.2.13; 10.3; 14 |
| **Closing with Alternative Backup Bidders**: Backup Bidder will be selected at Auction (if an Auction occurs) | 10.2.10; 11.1; 11.2 |
| **The Auction**: will occur by Zoom on September 18; open to creditors and parties in interest | 10 |

C. **The Bid Procedures**

28. The proposed Bid Procedures are attached hereto as **Exhibit 3**. The Bid Procedures are summarized as follows:

a. <u>Qualified Bid</u>. To participate in the bidding process and to have a bid considered by Debtor, each potential bidder must deliver a written offer satisfying the criteria set forth below. A "<u>Qualified Bidder</u>" is a party that timely delivers a binding bid that in Debtor's discretion satisfies the criteria set forth below (a "<u>Qualified Bid</u>") and satisfies the other criteria described in the Bid Procedures.

b. <u>Bid Deadline</u>. Each bid package must be delivered in electronic form to Debtor's counsel, ONSAGER | FLETCHER | JOHNSON | PALMER LLC, Attn: Andrew D. Johnson (ajohnson@OFJlaw.com) and Gabrielle G. Palmer (gpalmer@OFJlaw.com) so as to **actually be received no later than September 30, 2024 at 5:00 p.m. (prevailing Mountain Time) (the "Bid Deadline")**.

c. <u>Bid Requirements</u>. Each bid must include the following:

i. The legal name of the party submitting the Bid, along with the name of any equity holders or other financial backers, if the party submitting the Bid is an entity, or an identification of any insider of Debtor who is involved.

ii. A clean and blackline version clearly marked to show any changes requested by the bidder compared with the APA and all other required provisions set forth in these Bid Procedures ("<u>Modified APA</u>"). For the avoidance of doubt, the APA and any Modified APA remain subject to final approval by the Court.

iii. A list of executory contracts and unexpired leases that the bidder proposes to assume, if any.

iv. A signed copy of the Bid Procedures.

v. A statement that the Bid is formal, binding and unconditional, is not subject to any due diligence or financing contingency, and is irrevocable until the first business day following the closing of the proposed sale transaction, except as otherwise provided in these Bid Procedures. The submission of a Bid by the Bid Deadline shall constitute a binding and irrevocable offer to acquire the Assets and assume the executory contracts and unexpired leases designated in the Bid, if any.

vi. A bidder must have, in Debtor's reasonable business judgment, the necessary financial capacity to consummate the proposed transaction required by its Bid. To the extent applicable, a Bid must include

7

        committed irrevocable financing, documented to Debtor's reasonable satisfaction, demonstrating the bidder has or will receive sufficient debt and/or equity funding to satisfy the bidder's purchase price and other obligations under its Bid and the identity and contact information of the specific person(s) or entity(s) responsible for such committed financing whom Debtor or any representative should contact regarding such committed financing. Other than the bidder becoming the Successful Bidder (defined below), such funding commitments or other financing may not be subject to any other contingencies or further approvals, including but not limited to internal approvals, syndication requirements, due diligence, or other approvals. Stalking Horse is deemed to have the financial capacity to satisfy the purchase price.

        vii.    A written acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the bidder's proposed Modified APA.

        viii.    Evidence acceptable to Debtor of all bidder entity authorizations or approvals from its board of directors or comparable governing body with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

    d.    <u>Deposit</u>. To be a Qualified Bid, each Bid must be accompanied by a good faith cash in the amount of 10% of the purchase price under the Modified APA (the "<u>Deposit</u>") with Debtor's counsel by wire pursuant to wire instructions that will be provided to each bidder upon request.

    e.    <u>Minimum Bid</u>. The amount of the cash purchase price in any bid (other than the bid submitted by the Stalking Horse) for the Assets must provide for cash of at least $334,000 (which is the sum of (i) the Purchase Price contained in the APA ($300,000), (ii) the amount of the Break-Up Fee ($9,000), (iii) the amount of the Expense Reimbursement ($5,000), and (iv) a $20,000 minimum overbid, with a cash component at Closing of no less than $334,000 (the "<u>Minimum Bid</u>").

    f.    <u>No Additional Bid Protections</u>. The bid must not request or entitle the bidder to any break-up fee, expense reimbursement, or similar type of payment, or propose to modify any of the Bid Procedures.

    g.    <u>Closing</u>. Each bid must include a commitment to close the transactions

contemplated by the Modified APA by no later than the Closing Date set forth in the APA, which is October 31, 2024.

29. Debtor shall have the right, in its sole discretion and subject only to the Bid Procedures, to determine whether a Bid is a Qualified Bid. For the avoidance of doubt, Stalking Horse is a Qualified Bidder, and the APA constitutes a Qualified Bid.

30. Auction Notice. No later than **September 18, 2024**, Debtor shall provide electronic notice (the "Auction Notice") to all Qualified Bidders, creditors, and interested parties by filing such notice in the Bankruptcy Case: (a) that Qualified Bids were timely received; (b) whether an Auction will take place; (c) the video conference information for the virtual Auction; and (d) the terms of the highest or best Qualified Bid where the bidding will start (the "Baseline Bid"). The Auction Notice shall contain instructions on how to access the virtual Auction. The Auction Notice will be filed with the Bankruptcy Court and sent to each Qualified Bidder via e-mail and in the manner and to the person designated by such Qualified Bidder pursuant to the Modified APA submitted with the Bid.

31. Auction. If Debtor receives more than one Qualified Bid (other than Stalking Horse's APA), Debtor may conduct an Auction with respect to the Assets. Any Auction will take place virtually through video conferencing on **October 4, 2024 starting at 10:00 a.m. (prevailing Mountain Time)**, or by such other means, date and time as Debtor may designate at or prior to the Auction. If no Qualified Bids other than the one submitted by Stalking Horse are submitted, Debtor shall not hold an Auction and, upon entry of a sale order or confirmation of a Plan, shall be permitted to sell the Assets to Stalking Horse pursuant to the terms and conditions set forth in the APA.

32. If there is an Auction, the Auction shall be governed by the following procedures:

    a. Participation. Only Qualified Bidders shall be entitled to participate in the Auction, and each Qualified Bidder shall appear virtually at the Auction or through a duly authorized representative. At least one day prior to the commencement of the Auction, each Qualified Bidder must confirm in writing that it will participate in the Auction; provided, however, that in the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith.

    b. Anti-Collusion. At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged and will not engage in any collusion with any other Qualified Bidder with respect to the bidding or the Sale.

    c. Conduct of Auction. The Auction will be conducted openly and all creditors and interested parties shall be permitted to attend. All Qualified Bids shall be made on the record and in the presence of all other Qualified Bidders. All material terms of the bid that is deemed to be the highest or otherwise best bd for each round of bidding shall be fully disclosed to the Qualified Bidders.

  d. <u>Bidding</u>. Bidding at the Auction will start based on the purchase price and terms proposed in the Baseline Bid.

  e. <u>Bidding-General</u>. Bidding shall start with the Baseline Bid and continue with subsequent Qualified Bids in the order in which each Qualified Bid was received. Qualified Bidders may submit successive bids in increments of at least $10,000 over the previously accepted Qualified Bid.

  f. <u>Successive Bidding</u>. Each successive bid must be a Qualified Bid (except for those requirements of a Qualified Bid that were only required to be satisfied at the time of the initial submission of such bid). Each successive bid submitted at the Auction shall constitute an irrevocable offer and shall be binding on the Qualified Bidder submitting such bid.

  g. <u>Must Bid in Each Round</u>. Each Qualified Bidder must bid in each round of the Auction and any Qualified Bidder that fails to submit a bid in any round shall be disqualified from bidding in any successive rounds at the Auction.

  h. <u>Additional Financial Information</u>. Debtor has the right to request any additional financial information to enable Debtor to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by such bidder's subsequent bids submitted during the Auction, and any further information that Debtor believes is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction.

  i. <u>Successful Bid</u>. If an Auction is conducted, it shall continue until Debtor determines which offer is the highest or otherwise best offer from among the Qualified Bids submitted at the conclusion of Auction (the "<u>Successful Bid</u>"). The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder."

  j. <u>Backup Bid</u>. At the conclusion of the Auction, Debtor will also announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "<u>Backup Bid</u>"). The Qualified Bidder submitting such Backup Bid shall become the "Backup Bidder."

  k. Debtor may adopt rules for an Auction at any time that Debtor reasonably determines to be appropriate to promote the goals of obtaining the highest and best amount for the Assets and consistent with these Bid Procedures.

  l. Debtor reserves the right to, and may, reject at any time before entry of a Confirmation Order or Sale Order (both defined below) any bid that, in its judgment, is inadequate or insufficient or not in conformity with the requirements of the Bankruptcy Code, these Bid Procedures or the terms and conditions of the applicable sale transaction.

      m.      Notwithstanding anything to the contrary contained herein, Debtor reserves the right, in its reasonable discretion, to cancel, continue or adjourn any Auction and to modify these procedures.

      n.      Unless otherwise required pursuant to Debtor's fiduciary duties, Debtor shall not consider any bids submitted after the conclusion of the Auction.

      o.      If Debtor does not receive one or more Qualified Bids by the Bid Deadline, Debtor may choose to reschedule, cancel or forego the Auction. If Debtor receives only one Bid by the Bid Deadline, Debtor may work with that bidder to confirm that the Bid meets all the requirements of a Qualified Bid and may seek to have a Sale with such bidder approved by the Bankruptcy Court. Notwithstanding anything set forth herein to the contrary, Debtor retains absolute discretion to determine whether to proceed with a Sale. Post-Auction Process.

33.      <u>Post-Auction Process.</u>

      a.      The Successful Bidder and the Back-Up Bidder shall, on or before October 7, 2024, submit to Debtor fully executed revised documentation memorializing the terms of the Successful Bid and the Back-Up Bid. The Successful Bid or any Back-Up Bid may not be assigned to any party without the prior written consent of Debtor.

      b.      Following the conclusion of the Auction and no later than October 7, 2024, Debtor shall file a Notice of Auction Results with the Bankruptcy Court. The purpose of the Notice of Auction Results is to notify creditors and interested parties of the Successful Bidder at the Auction, which Successful Bidder will be obligated to close the transaction contemplated by the APA or Modified APA, as applicable, pursuant to any confirmed chapter 11 plan.

      c.      <u>Treatment and Return of Deposits</u>.

      i. <u>Non-Qualified Bidders</u>. As soon as practical after Debtor determines that a particular bidder was not a Qualified Bidder, Debtor's counsel shall return to each such bidder, such bidder's Deposit. Upon the authorized return of such bidder's Deposit, the bid of such bidder shall be deemed revoked and no longer enforceable.

      ii. <u>Qualified Bidders</u>. With the exception of the Deposit of the Successful Bidder and any Back-Up Bidder, Debtor's counsel shall return to any other Qualified Bidder's Deposit as soon as practical after the conclusion of the Auction.

      iii. <u>Qualified Bidders Forfeiture</u>. The Deposit of a Qualified Bidder will be forfeited to the Debtor if the applicable Qualified Bidder attempts to modify, amend or withdraw its Qualified Bid, except as permitted by these Bid Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures.

iv. <u>The Successful Bidder</u>. The Deposit of a Successful Bidder shall be applied against the purchase price of such Successful Bidder upon the consummation of the transaction proposed in the applicable Successful Bid.

v. <u>Successful Bidder Forfeiture</u>. The Successful Bidder's Deposit shall be forfeited to Debtor if a Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate the transaction according to these Bid Procedures and the terms of the applicable transaction documents with respect to the Successful Bid.

vi. <u>Back-Up Bidder</u>. Debtor's counsel shall return a Back-Up Bidder's Deposit as soon as practicable after the closing of the Sale with the Successful Bidder. In the event that the Successful Bidder fails to close on the Sale, the Deposit of the Back-Up Bidder shall be applied to the purchase price of the Back-Up Bidder upon the consummation of the transaction proposed in the applicable Back-Up Bid. The Back-Up Bidder's Deposit shall be forfeited to Debtor if the Successful Bidder fails to close the transaction, and the Back-Up Bidder fails to close the transaction.

d. <u>Reservation of Rights</u>. Debtor reserves the right, in its reasonable discretion and subject to the exercise of its business judgment, to alter or terminate these Bid Procedures, to waive terms and conditions set forth herein with respect to all bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, conditions and deadlines of the Bidding and Auction Process to promote further bids and/or to terminate discussions with any and all prospective acquirers and investors at any time and without specifying the reasons therefore, in each case to the extent not materially inconsistent with these Bid Procedures; provided further that the Debtor's exercise of discretion in evaluating bids and administering the Bid and Auction process does not permit, and shall not be construed as permitting, the Debtor to materially deviate from the procedures, terms, conditions and protections set forth in these Bid Procedures.

**D.     The Sale Notice**

34.     On or within two (2) business days after entry of the Bid Procedures Order, Debtor will cause the Sale Notice to be served on the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) all parties who are known or reasonably believed, after reasonable inquiry, to have <u>asserted</u> any lien, claim, encumbrance or interest in the Assets; (c) all of Debtor's creditors; and (d) all other parties that have request or that are required to receive notice pursuant to Bankruptcy Rule 2002.

35.     Debtor respectfully submits that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale of the Assets, including (a) the date, time and place of the Auction (if one is held); (b) the Bid Procedures; (c) a description of the sale as being free and clear of liens, claims, encumbrances and other interests, with such liens, claims, encumbrances and other interests attaching with the same validity and priority to the sale proceeds.

36. Debtor further submits that notice of this Motion, coupled with service of the Sale Notice and the subsequently served plan, constitutes good and adequate notice of the sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Fed. R. Bankr. P. 2002 and Local Rules 2002-1 and 9013-1.

E. **The APA and Stalking Horse Summary Pursuant To LBR 6004-1(d)**

37. A summary of the terms of the APA is as follows:

   a. **Purchase Price**. The consideration to be paid by the Purchaser is valued at $300,000 as follows: (i) $100,000.00, plus (ii) the deemed satisfaction, for the benefit of Debtor's bankruptcy estate, of the debt, claims, and security interests arising from the Loan Agreement, and (iii) the deemed satisfaction, for the benefit of Seller's bankruptcy estate, of any debt or claim arising from the Unsecured Loan. The APA also contains a provision for prorations on expenses and revenue that straddle the closing date. *See APA § 2.3*.

   b. **Purchased Assets**. The Purchased Assets are substantially all assets of Debtor, including (a) Inventory; (b) Intellectual Property (including copyrights, trademarks, tradenames and goodwill); (c) furniture, fixtures, and equipment; (d) Books and Records; (e) Debtor's interests in leases of real property; and (f) prepaid expenses and deposits. *See APA § 1.2*. The Purchased Assets do not include (i) cash or bank deposits; (ii) tangible personal property sold in the ordinary course of business prior to Closing; (iii) insurance policies; (iv) books and records related to excluded assets and employment records Debtor is required to keep; and (vi) avoidance actions. *See APA § 1.3*.

   c. **Sale Order.** The APA provides that the Court must enter the Sale Order by October 31, 2024. *See APA § 9.1(e)*.

   d. **Records Retention/Access.** Sellers shall be entitled to access a copy of all Books and Records for the purpose of winding-up its affairs for three months following closing. *See APA § 10.2*.

   e. **Agreements with Management.** None

   f. **Earnest Money Deposit**. None.

   g. **Identity of Purchaser.** Boria Capital LLC, which is owned by Chris Leevers. Purchaser and Mr. Leevers are not insiders of Debtor. Mr. Leevers advanced $155,000 in unsecured loans to Debtor prior to the Petition Date and was not repaid. Mr. Leevers advanced unsecured credit on a post-petition basis. Purchaser is also willing to make a secured loan to Debtor, for which Debtor is seeking separate approval.

   h. **Assumption of Executory Contracts and Unexpired Leases.** The proposed Sale contemplates that Debtor will assume and assign to Purchaser certain of its

executory contracts and all of its unexpired leases of non-residential real property associated with the other Purchased Assets (i.e., the Assumed Contracts) pursuant to § 365 of the Bankruptcy Code.

i. **Representations, Warranties and Covenants**. Debtor made various representations customary for a transaction of this kind including, but not limited to, those relating to organization and good standing, authorization and validity, qualification, absence of conflicts, and litigation. *See APA Article 5*. Purchaser has made certain representations, among others, relating to organization, good standing and authorization, absence of conflict, sufficiency of funds, solvency, litigation, and independent investigation. *See APA Article 5*.

j. **Conditions.** The Closing is conditioned upon the occurrence of certain events customary for transactions of this kind, including payment in full of the Purchase Price at Closing, the truthfulness of all representations and warranties, and all consents and approvals, including approvals of the Bankruptcy Court, having been obtained. *See APA §§ 8.2 through 8.3*.

k. **Alternative Transaction.** The APA will terminate and the Deposit will be returned if Debtor proposes, pursues, supports and/or consummates a sale transaction with another party or is required to do so by court order or fails to close the transaction by October 31, 2024. *See APA § 10*.

l. **Closing.** Closing of the Sale will take place on or before October 31, 2024. *See APA § 8.1*.

## LEGAL AUTHORITY

A. **The Bid Procedures Should be Approved**

38. A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (*quoting In re Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same). *See also In re Integrated Resources, Inc.*, 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

39. The paramount goal in any proposed sale of property of the estate is to maximize proceeds. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc*., 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the

objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

40. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated Resources*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankruptcy estates").

41. Courts regularly approve reasonable break-up fees and reasonable expense reimbursements in the context of a bankruptcy auction. *See, e.g., In re Bouchard Transp. Co.*, 74 F.4th 743, 747 (5th Cir. 2023); *In re Bighorn Restaurants LLC,* 23-11919-MER (Bankr. D. Colo. May 23, 2023) [Docket No. 165]. Break-up fees are designed to encourage a party to invest the time and money into making an initial bid. *In re Bouchard Transp. Co.*, 74 F.4th 743, 747 (5th Cir. 2023). A 3% break-up fee is within the range of reasonable. *See, e.g., In re Bouchard Transp. Co.*, 74 F.4th 743, 747 (5th Cir. 2023); *In re Bighorn Restaurants LLC,* 23-11919-MER (Bankr. D. Colo. May 23, 2023) [Docket No. 165].

42. Debtor believes that the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bid Procedures will allow Debtor to conduct the sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best amount for the Assets and who can demonstrate the ability to close a transaction. Specifically, the Bid Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties. In addition, since Debtor's Assets have been exposed to the market for more than one year, Debtor asserts that the proposed timeline for the potential sale is adequate.

43. Debtor submits that the proposed Bid Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding in bankruptcy proceedings.

B. **The Form and Manner of the Sale Notice Should be Approved**

44. Pursuant to Bankruptcy Rule 2002(a), Debtor is required to provide creditors with 21 days' notice of a sale hearing, as may be reduced by the Court. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and any hearing and the deadline for filing any objections to the relief requested herein.

45. Debtor submits that notice of this Motion, coupled with service of the Sale Notice, and a plan, as provided for herein, constitute good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

15

46. A plan that includes a transfer of the Assets as provided in the APA to the Stalking Horse or best and highest bidder will be filed no later than September 18, 2024.

**WHEREFORE**, Debtor requests that the Court enter an Order:

    a. Granting this Bid Procedures Motion;

    b. Approving and authorizing the Bid Procedures (including all deadlines and procedures set forth therein);

    c. Approving the Bid Protection to the Stalking Horse in the APA; and

    d. Granting such other and further relief as the Court deems proper.

Dated: August 30, 2024                     Respectfully submitted,

                                              **ONSAGER | FLETCHER | JOHNSON | PALMER LLC**

                                              *s/ Gabrielle G. Palmer*
                                                  Andrew D. Johnson, #36879
                                                  Gabrielle G. Palmer, #48948
                                              600 17th Street, Suite 425 North
                                              Denver, Colorado 80202
                                              Ph: (720) 457-7059
                                              ajohnson@OFJlaw.com
                                              gpalmer@OFJlaw.com

                                              *Attorneys for Ink! Coffee Company*