# EXHIBIT 1

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (together with all Schedules and Exhibits hereto, this "**Agreement**"), dated as of August 27, 2024, is entered into by and between Ink! Coffee Company, a Colorado corporation ("**Seller**"), and Boria Capital, LLC,  a Colorado limited liability company ("**Buyer**").

### R E C I T A L S :

A.     On June 20, 2024, Seller filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Case No. 24-13445-KHT, in the United States Bankruptcy Court for the District of Colorado (the "**Bankruptcy Court**").

B.     Seller owns and operates retail coffee shops as Ink! Cafes and Ink! Coffee and operates an online platform selling coffee beans and branded merchandise (the "**Business**").

C.     Seller currently operates four brick and mortar retail locations around Colorado.

D.     Seller desires to sell substantially all of its assets, including its equipment, inventory, tradenames, and other intellectual property, goodwill, assumed contracts and leases, personal property, and other assets (the "**Sale**").

E.     Seller and Buyer are parties to that certain Debtor In Possession Loan Agreement (the "**Loan Agreement**") of even date, which provides for the Buyer to advance up to $164,000 to Seller on a secured basis, all pursuant to the terms and conditions contained in the Loan Agreement, and subject to Bankruptcy Court approval.

F.     The principal of Buyer is Chris Leevers. Mr. Leevers has provided seller with post-petition unsecured credit in the amount of $36,000 (the "**Unsecured Credit**")

E.     Seller desires to sell to Buyer, and Buyer desires to purchase and acquire from Seller, substantially all of the assets of Seller related the Business, upon the terms and conditions set forth herein.

## ARTICLE 1
## SALE AND PURCHASE OF ASSETS

1.1     Sale of Assets.  Subject to entry of a final Order by the Bankruptcy Court approving this Agreement and authorizing the transaction contemplated herein, which may be through a plan of reorganization (the "**Sale Order**"), Seller shall sell and transfer to Buyer all of Seller's right, title an interest in the assets described in Section 1.2 below, but excluding certain assets described in Section 1.3 below. All rights, assets and property of Seller to be sold and transferred to Buyer pursuant to this Article I are referred to as the "**Purchased Assets.**" For the purpose of this Agreement the Sale Order shall be "final" so long as it is not subject to an order from the Bankruptcy Court or other court of competent jurisdiction staying the Sale Order.

1.2     The Purchased Assets include the following:

(a)   Personal Property.  All inventory, furniture, fixtures, office materials and supplies, and other tangible personal property owned or held by Seller ("**Tangible Personal Property**"), including the location thereof, and any additions, improvements, replacements and alterations thereto made between the date hereof and the Closing Date (hereinafter defined) in accordance with the provisions hereof; and all of Seller's interest in any improvements, fixtures and appurtenances located on the Leased Real Property (hereinafter defined). For the purposes hereof, "**Inventory**" means goods held and/or owned by Seller for resale.

(b)   Interests in Real Property.  Seller does not own any real property.  All leasehold interests in real property, including buildings and any improvements thereon used in the operation of the Business (the "**Leased Real Property**") are set forth on Schedule 1.2(b);

(c)   Purchased Contracts.  Those contracts, commitments, agreements, leases (including for the use of the Leased Real Property), licenses, understandings and obligations, whether written or oral, whether executory or non-executory, to which Seller is a party or by which Seller or the Purchased Assets are bound or affected which are described on Schedule 1.2(c), which Buyer has elected to purchase in accordance with this Agreement (the "**Purchased Contracts**"). The Purchased Contracts shall also include all purchase orders that Seller places in the ordinary course of business for Inventory to be delivered after the Closing;

(d)   Intellectual Property and Trade Secrets.  All of Seller's intellectual property and trade secrets (collectively, the "**Intellectual Property**"), including those items listed on Schedule 1.2(d).  For the purposes hereof, Intellectual Property includes:

(i)   Seller's name, all assumed fictional business names, trade names, registered and unregistered trademarks, service marks and applications (collectively, "**Marks**");

(v)   all know-how, trade secrets, confidential or proprietary information, customer lists, technical information, data, and process technology (collectively, "**Trade Secrets**");

(vi)   all software, to the extent assignable to Buyer;

(vii)   all rights in internet web sites and internet domain names presently used by Seller;

(viii)   Seller's interests in accounts on social media platforms, to the extent assignable; and

(ix)   Seller's interests in customer programs, subscriber lists, and related programs, subject to the restrictions in 11 U.S.C. § 363(b)(1)(B), for which Buyer agrees to pay the costs of any consumer privacy ombudsperson appointed pursuant to 11 U.S.C. § 332., separate and apart from the Purchase Price (as defined below).

(e)   Goodwill.  All of Seller's goodwill in and going concern value of the Business.

2

(f)     Deposits and Prepaid Expenses.  All rights of Seller relating to deposits and prepaid expenses, claims for refunds and rights to postpetition offsets relating to the Purchased Assets, but excluding any deposits and prepaid expenses, claims for refunds and rights to offsets relating to any Excluded Assets (defined below).

(g)     Documents. Documents related to the Purchased Assets ("**Books and Records**"), to the extent requested by Buyer.

1.3     Excluded Assets.  The following assets are excluded from the sale:

(a)     all accounts receivable and trade accounts due to Seller in connection with the operation of the Business;

(b)     all accounting records, contents of email communications, technical data, asset ledgers and inventory records, together with all trade and barter books and records;

(c)     all cash on hand and on deposit in banks, cash equivalents and investments;

(d)     all Inventory sold, disposed of or consumed in the ordinary course of the operation of the Business from the date of this Agreement through Closing;

(e)     all of Seller's insurance policies, policies relating to property, liability, business interruption, health and workers' compensation, lives of officers of Seller, and disability of officers of Seller;

(f)      any pension, profit sharing or savings plans and trusts and the assets thereof;

(g)     minute books and membership books or similar internal documents of Seller or any of its predecessors in interest;

(h)     all claims for refunds of taxes and other governmental charges of whatever nature, as well as all tax attributes;

(i)      all causes of action and rights of recovery for avoidance actions of the Seller under 11 U.S.C. §§ 547 through 553;

(j)     all rights of Seller under this Agreement;

(k)     all Excluded Contracts (hereinafter defined);

(l)      any causes of action and claims of Seller arising out of or relating to transactions prior to the Closing Date;

(m)     all employment and personnel records and other records which Seller is required by law to retain in its possession;

(n)    any and all deposits, prepaid expenses, claims for refunds and rights to offsets relating to the Excluded Assets enumerated in the other subparagraphs in this Section 1.3.

1.4    Contracts, Purchased and Excluded.    Subject to entry of an Order by the Bankruptcy Court authorizing Seller to assume and assign the Purchased Contracts to Buyer that is in form and substance satisfactory to Buyer (the "**Assignment Order**"), the Purchased Contracts shall be assigned to Buyer as part of this Sale. To the extent required, Buyer shall provide adequate assurance of future performance to the counterparty to each Purchased Contract. Seller shall pay any cure costs required to be paid to such counterparty pursuant to 11 U.S.C. § 365 ("**Cure Amounts**"). Any contracts or leases not listed on Schedule 1.2(c) are collectively referred to as the "**Excluded Contracts**." Notwithstanding anything to the contrary contained in this Agreement, with respect to any contract or lease that is not set forth on Schedule 1.2(c) attached hereto, and provided that such contract or lease is still in effect and has not been rejected by Seller pursuant to section 365 of the Bankruptcy Code, upon written notice(s) from Buyer, as soon as practicable, Seller shall take all actions reasonably necessary to assume and assign to Buyer, pursuant to section 365 of the Bankruptcy Code, any contract(s) or lease(s) set forth in Buyer's notice(s); provided, that any applicable Cure Amount shall be satisfied by Buyer. Seller agrees and acknowledges that it shall provide Buyer with reasonable advance notice of any motion(s) by Seller to reject any contract or lease. Notwithstanding anything in this Agreement to the contrary, on the date any contract or lease is assumed and assigned to Buyer in writing pursuant to this Section 1.4, such contract or lease shall be deemed a Purchased Contract and deemed scheduled under the appropriate heading on Schedule 1.2(c) for all purposes under this Agreement.

1.5    Liabilities.    The Purchased Assets shall be sold and conveyed to Buyer free and clear of all liabilities, obligations, liens, security interests and encumbrances whatsoever provided, however, that Buyer will assume at Closing the following obligations (the "**Assumed Liabilities**"): (a) costs and expenses associated with the ownership and operation of the Purchased Assets arising after the Closing; (b) all liabilities under the Purchased Contracts, whether or not incurred pre-Closing or post-Closing, and all Cure Amounts; (c) all customer obligations related to goods sold by Seller prior to the Closing (including, for example, the right of customers to return goods sold by Seller prior to the Closing, the obligation to honor unused gift cards, etc.); and (d) liabilities for inventory ordered prior to the Closing Date but not received prior to the Closing Date. Except for the Assumed Liabilities, Seller shall retain responsibility for all liabilities incurred or accrued by Seller as of the Closing, and for all liabilities arising from Seller's operations prior to the Closing Date, whether or not accrued and whether or not disclosed. Specifically, but without limiting the generality of the foregoing, pursuant to this Agreement, Buyer shall not assume any liability or obligation of Seller with respect to employees or former employees of Seller (including without limitation any liability for accrued salaries, wages, severance payments, payroll taxes, health, medical, retirement, vacation or deferred compensation benefits), any taxes due or claimed to be due in respect of the Purchased Assets or the operation of the Business prior to the Closing.

1.6    No Obligations to Third Parties.    The execution and delivery of this Agreement shall not be deemed to confer any rights upon any person or entity other than the parties hereto, or make any person or entity a third party beneficiary of this Agreement, or to obligate either party to any person or entity other than the parties to this Agreement. The assumption by Buyer of any liabilities or obligations of Seller under Sections 1.5 and 2.3 shall in no way expand the rights or

remedies of third parties against Buyer as compared to the rights and remedies such parties would have against Seller if the Closing were not consummated.

## ARTICLE 2
## CONSIDERATION

2.1 <u>Purchase Price</u>.

(a) <u>Purchase Price</u>.  The total purchase price for the Purchased Assets is (i) $100,000.00, plus (ii) the deemed satisfaction, for the benefit of Seller's bankruptcy estate, of the debt, claims, and security interests arising from the Loan Agreement, and (iii) the deemed satisfaction, for the benefit of Seller's bankruptcy estate, of any debt or claim arising from the Unsecured Loan (in the aggregate is the "**Purchase Price**"), all of which may be subject to adjustment pursuant to Section 2.3. The Purchase Price shall be delivered by Buyer to Seller at Closing via wire transfer pursuant to wire transfer instructions Seller will provide to Buyer prior to the Closing.

2.2 <u>Allocation</u>.  The Purchase Price shall be allocated among the Purchased Assets as mutually agreed by the parties, which agreement shall occur no later than seven days prior to the Closing.

2.3 <u>Proration/Adjustments of Certain Items</u>.

(a) <u>Computation</u>.  Except as provided in Section 1.3 above, (i) Seller shall be entitled to all income, and shall be responsible for all expenses, arising out of or attributable to the operation of Business through the Closing Date and (ii) Buyer shall be entitled to all income, and shall be responsible for all expenses relating to the Purchased Assets and arising out of or attributable to the operation of the Business after the Closing Date. Subject to the foregoing, all overlapping items of income or expense shall be prorated between Seller and Buyer on a per diem basis as of the Closing Date, including without limitation the following:

(i) Prepaid expenses and deposits arising from monetary payments made for goods or services prior to the Closing Date where all or part of the goods or services have not been received or used by the Closing Date (for example, rents paid in advance for a rental period extending beyond the Closing Date but excluding any security deposits on Assumed Contracts);

(ii) Assumed Liabilities, customarily accrued, arising from expenses incurred but unpaid as of the Closing Date that straddle a period covering the Closing Date, including but not limited to rent payment, utilities, and the likes; and

(b) <u>Prorations</u>.  Prorations shall be identified and completed, insofar as reasonably possible, on the Closing Date and shall be paid by way of adjustment to the Purchase Price to the extent then determined. As to prorations that cannot be completed on the Closing Date, the parties shall, as soon as possible after the Closing Date, cooperatively determine all such prorations and pay the other the amount of any such adjustment. Notwithstanding anything in this Section 2.3 which may be to the contrary, except for the items described in Section 2.3(a)(i) and (ii) above, no prorations shall be payable by either Seller or Buyer until the amount of such

5

prorations exceed $5,000. Items which are personal and thus non-transferable to Buyer shall not be considered as prorations, such as insurance, fees to merchant processors and many software license fees.


# ARTICLE 3
# BANKRUPTCY COURT APPROVAL

3.1     Bankruptcy Court Approval.  This Agreement is subject to and shall not become effective until approved by written order of the Bankruptcy Court in the Bankruptcy Case.

3.2     Sale Motion.  Seller shall file a motion with the Bankruptcy Court seeking approval of this Agreement and authority to sell the Purchased Assets free and clear of all liens, claims and encumbrances authorized pursuant to 11 U.S.C. §§ 363(b) and (f), to be consummated through a plan of reorganization.  Seller shall also seek approval to assume and assign the Purchased Contracts pursuant to 11 U.S.C. § 365, either in the Sale Motion, a motion to assume the Purchased Contracts, or through a Subchapter V Plan of Reorganization.  Buyer shall use reasonable efforts to cooperate with and assist Seller in its efforts to obtain Court approval of this Agreement and the assumption and assignment of the Purchased Contracts.


# ARTICLE 4
# REPRESENTATIONS AND WARRANTIES

4.1     Representations and Warranties of Seller.  Except as expressly set forth in writing in this Agreement, the Purchased Assets are being sold "AS IS" and "WHERE IS" with no representations or warranties of any kind, express or implied, oral or written, with respect to the physical condition, faults or value of the Purchased Assets.  There is no warranty relating to title, possession, quiet enjoyment or the like in this disposition.  Upon the Closing, Buyer shall assume all responsibility, shipping costs, storage costs, liability and obligation for the physical condition and status of the Purchased Assets. Seller makes no express or implied warranties, representations or endorsements whatsoever, including, without limitation, warranties of merchantability, non-infringement, fitness for a particular purpose or any other fact or matter not expressly set forth herein, and Seller hereby expressly disclaims any such warranties to the maximum extent permitted by applicable law. Seller makes no representation or warranty and shall have no liability whatsoever on behalf of Seller or any third parties with regard to the operation, performance, nonperformance, quality, availability, completeness, accuracy or security any of the Purchased Assets or the delay, error, or interruption of the flow of information in connection with use of any of the foregoing.  Buyer is sophisticated with respect to the Purchased Assets.  Notwithstanding the foregoing, Seller represents and warrants to Buyer, as follows:

(a)     Organization and Good Standing.  Seller is a limited liability company in existence under the laws of the State of Colorado, and is duly qualified to do business and in good standing in Colorado.  Seller has all requisite power and authority to own, operate and lease the Purchased Assets and to conduct the operations of the Business as presently conducted.

6

(b)     Authority.  Subject to the approval of the Bankruptcy Court, (i) Seller has all requisite power and authority to execute, deliver and perform this Agreement and any other related documents required to be delivered by Seller pursuant to this Agreement at or before Closing (the "**Seller Agreements**") and to enter into the Seller Agreements and to consummate the transactions contemplated thereby, (ii) the execution, delivery and performance of the Seller Agreements and the consummation of the transactions contemplated thereby have been or, with respect to Seller Agreements deliverable prior to or at Closing will upon delivery be, duly and validly authorized by all necessary action on the part of Seller, and (iii) the Seller Agreements have been or, with respect to Seller Agreements deliverable prior to or at Closing, will upon delivery be, duly executed and delivered by Seller and, with respect to Seller Agreements deliverable prior to or at Closing, will upon delivery, constitute the valid and binding obligations of Seller, enforceable against it in accordance with its terms.

(c)     No Conflict or Breach.  Subject to approval of the Bankruptcy Court, the execution, delivery and performance of the Seller Agreements do not and will not (i) conflict with or constitute a violation of the Articles of Organization or Operating Agreement of Seller; or (ii) conflict with or constitute a material violation of any law, statute, judgment, order, decree or regulation of any legislative body, court, administrative agency, governmental authority or arbitrator applicable to or relating to Seller, the Business or the Purchased Assets.

(d)     Litigation. Except for the Bankruptcy Case, no action, suit, or other legal proceeding before any governmental body or arbitrator is pending or, to Seller's Knowledge, threatened to which either entity is a party and which relates to the Purchased Assets or the transaction contemplated hereby. For the purposes of this Agreement as to the Seller, "**Knowledge**" shall mean the actual knowledge of Seller's Chief Executive Officer, Keith Herbert.

(e)     Violation of Laws. Seller has not received written notice of any violation of any laws applicable to the Purchased Assets by any governmental authority having jurisdiction over the Purchased Assets that may have a material adverse effect and that has not been cured, corrected, or waived, and to Seller's Knowledge, there is no such violation of any such laws.

4.2     Buyer's Representations and Warranties.  Buyer represents and warrants to Seller as follows:

(a)     Organization and Good Standing.  Buyer is limited liability company in existence under the laws of the State of Colorado.  Buyer is duly qualified to do business in Colorado.

(b)     Authority.  Buyer has all requisite power and authority to execute, deliver and perform this Agreement and other related documents required to be delivered by Buyer pursuant to this Agreement at or before Closing (the "**Buyer Agreements**") and to consummate the transactions contemplated thereby.  The execution, delivery and performance of the Buyer Agreements and the consummation of the transactions contemplated thereby have been or, with respect to Buyer Agreements deliverable prior to or at Closing will upon delivery be, duly and validly authorized by all necessary action on the part of Buyer.  The Buyer Agreements have been or, with respect to Buyer Agreements deliverable prior to or at Closing, will upon delivery be, duly executed and delivered by Seller and, with respect to Seller Agreements deliverable prior to or at

Closing, will upon delivery, constitute the valid and binding obligations of Buyer, enforceable against it in accordance with its terms.

(c)     <u>No Conflict or Breach</u>.  The execution, delivery and performance of the Buyer Agreements do not and will not (i) conflict with or constitute a violation of the Buyer's organizational documents or any management or operating agreements of Buyer; (ii) conflict with or constitute a violation of any law, statute, judgment, order, decree or regulation of any legislative body, court, administrative agency, governmental authority or arbitrator applicable to or relating to Buyer; or (iii) conflict with, constitute a default under, result in a breach or acceleration of or require notice to or the consent of any third party under any contract, agreement, commitment, mortgage, note, license or other instrument or obligation to which Buyer is party or by which it is affected.

(d)     <u>Consents and Approvals</u>.   No (i) consent, approval, authorization, registration or filing with any federal, state or local judicial or governmental authority or administrative agency or (ii) consent, approval, authorization of or notice to any other third party, is required in connection with the valid execution and delivery by Buyer of the Buyer Agreements or the consummation by Buyer of the transactions contemplated therein.

(e)     <u>Litigation.</u> No actions, suits or proceedings are pending, or to the actual knowledge of Buyer's officers, threatened in writing before any governmental body or arbitrator against Buyer which are reasonably likely to impair materially Buyer's ability to perform its obligations under this Agreement.

(f)     <u>Financing</u>. Buyer has sufficient cash, available lines of credit or other sources of immediately available funds (in United States dollars) to enable it to pay the Purchase Price to Seller at the Closing. Buyer shall provide Seller with verifiable documentation confirming the foregoing concurrently with this Agreement.

(g)     <u>Limitation</u>. Other than Seller's representations and warranties expressly set forth herein, Buyer has not relied upon any oral or written information provided by Seller or its agents and further represents and acknowledges that it has had access to documents and information regarding the Purchased Assets and Seller's senior level management and in making the decision to enter into this Agreement and consummate the transactions contemplated hereby, Buyer has relied solely on the basis of its own independent due diligence investigation of the Purchased Assets.

(h)     <u>As-Is Sale</u>. Buyer expressly acknowledges that the Purchased Assets are being sold and accepted **AS IS, WHERE-IS, WITH ALL FAULTS,** and except as expressly stated herein, Seller make no representation or warranty, express or implied, with respect to any aspect of the Purchased Assets. **OTHER THAN WITH RESPECT TO SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, BUYER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS BUYER MIGHT HAVE REGARDING ANY FORM OF REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO ANY WARRANTY OF TITLE, CONDITION, HABITABILITY, MERCHANTABILITY,**

**FITNESS FOR A PARTICULAR PURPOSE, OR STATUS OF ENTITLEMENTS** relating to the Purchased Assets, such waiver being absolute, complete, total and unlimited in any way. Buyer further acknowledges that the compensation to be paid to Seller for the Purchased Assets takes into account that the Purchased Assets are being sold subject to the exceptions, disclaimers and waivers contained in this Agreement. The foregoing waivers will be given full force and effect according to each of their express terms and provisions. Notwithstanding anything herein to the contrary, all of the terms and provisions of this Section  shall survive the Closing or a termination of this Agreement.

## ARTICLE 5
## COVENANTS

5.1     <u>Conduct of Business</u>.  Between the date of this Agreement and the Closing Date, Seller shall use its commercially reasonable efforts to:

(a)     <u>Operation of Business</u>.  Operate the Business in the normal and customary manner in the ordinary course of business;

(b)     <u>Material Obligations</u>.  Perform all of its material obligations under any provision of the Purchased Contracts;

(c)     <u>Preservation of Business</u>.  Preserve the organization of the Business intact and maintain its relationships with its employees, suppliers and customers; and

(d)     <u>Sale of Purchased Assets</u>.  Not sell or dispose of any Purchased Assets except for Inventory in the ordinary course of business and obsolete or non-working assets.

5.2     <u>Consents and Notices</u>.  Seller shall use its reasonable efforts to obtain any required consents for the assumption and/or assignment of the Purchased Contracts prior to the Closing, which shall not include Seller's payment of any monies.  Buyer agrees to cooperate with Seller and to provide such information as Seller shall reasonably request in connection with the solicitation of such consents, and to pay for any costs associated therewith.

5.3     <u>Employees</u>. At any time following the Sale Order, Buyer at its option may extend an offer of employment to any of Seller's current employees to become effective upon the Closing. Solely to the extent Buyer enters into an employment agreement with a Seller employee prior to the Closing Date, Buyer shall promptly disclose the terms of such agreement to the Seller. A redacted copy of any employment agreement shall be filed with the Bankruptcy Court but unredacted copies shall be made available to the Bankruptcy Court and the Office of the United States Trustee.

## ARTICLE 6
## BUYER PROTECTIONS

6.1     <u>Break-Up Fee</u>.   In consideration of the substantial commitment of time and resources by Buyer to the preparation, negotiation, execution and performance of this Agreement, in the event that Seller consummates an Alternative Transaction (as defined below), subject to Buyer not then being in material breach of any provision of this Agreement, Seller, at the closing of such Alternative Transaction, and as a condition thereto, shall pay to Buyer $9,000 (the "**Break-Up Fee**"), which is equal to three percent (3.0%) of the Purchase Price, and all reasonable, actual and documented costs and out-of-pocket expenses incurred by Buyer prior to and after the date hereof in connection with the negotiation, preparation, execution and entry, as applicable, of this Agreement, and the transactions contemplated hereby and thereby, including, without limitation, fees and disbursements of legal counsel and financial advisors and those incurred in connection with Buyer's investigation and due diligence of Seller, the Purchased Assets and the Assumed Liabilities, in an amount not to exceed $5,000.00 (the "**Expense Reimbursement**"), which amounts shall be paid to Buyer prior to any other payments or allocations. The Break-Up Fee and Expense Reimbursement shall have first superpriority administrative expense claim status under sections 503(b) and 507(a) of the Bankruptcy Code and be senior in priority to all other administrative expense claims and claims, including those granted to any debtor-in-possession lenders or agents, without the need for any further application or motion of Seller or Buyer, or the entry of any further order of the Bankruptcy Court.

6.2     <u>Protections</u>.  Buyer and Seller acknowledge that, under the Bankruptcy Code, the sale of Purchased Assets is subject to approval of the Bankruptcy Court.  Buyer and Seller acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or best value possible for the Purchased Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Purchased Assets to prospective bidders, entertaining higher or better offers from qualified bidders and, if necessary, conducting an Auction and selling the Purchased Assets to another qualified bidder.  Seller shall comply with all of the provisions of any such orders from the Court.  Seller's obligation to pay the Break-Up Fee and the Expense Reimbursement pursuant to <u>Section 6.1</u> shall survive termination of this Agreement and shall constitute first superpriority administrative expense claim status under sections 503(b) and 507(a) of the Bankruptcy Code and be senior in priority to all other administrative expense claims and claims, including those granted to any debtor-in-possession lenders or agents, without the need for any further application or motion of the Seller or Buyer, or the entry of any further order of the Bankruptcy Court.

6.3     <u>Alternative Transaction</u>.  "**Alternative Transaction**" means any transaction or series of related transactions (other than pursuant to this Agreement), whether effectuated pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed by Seller, pursuant to which Seller: (i) accept a competing, qualified bid that is submitted in accordance with the any bidding procedures that are approved by the Bankruptcy Court, other than that of Buyer or its Affiliates, as the highest or otherwise best offer for any or all of the Purchased Assets; or (ii) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an acquisition, asset sale, stock sale, purchase, merger, reorganization, recapitalization or other similar transaction with or involving any equity securities in Seller or interests in the Purchased Assets, including a

10

plan of reorganization, plan of liquidation, or refinancing, any or all of the Purchased Assets (or agrees to any of the foregoing) in a transaction or series of transactions to a party or parties other than Buyer or its Affiliates.

# ARTICLE 7
## CONDITIONS TO OBLIGATIONS TO CLOSE

7.1     Buyer's Obligations.   The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction of the following conditions on or before the Closing Date, unless specifically waived in writing by Buyer prior to the Closing Date:

(a)     Representations and Warranties.   The representations and warranties of Seller contained in this Agreement shall have been true and correct in all material respects on the date of this Agreement and shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date.

(b)     Compliance with Covenants.   Seller shall have duly performed and complied with all covenants, agreements and obligations required by this Agreement to be performed or complied with by it on or prior to the Closing in all material respects.

(c)     No Injunctions.   No stay, preliminary or permanent injunction or other order, injunction, judgment, decision, verdict, decree, ruling, writ, assessment or award of any Governmental Body specifically directed at a particular party and not of general applicability restraining or prohibiting (or which make illegal or enjoins or prevents) the consummation of the transactions contemplated hereby shall be in effect.

(d)     Transfer of the Purchased Assets.   Seller shall have delivered to Buyer instruments of conveyance of the Purchased Assets, as well as consents to the transfer of the Purchased Contracts, to the extent applicable.

(e)     Bankruptcy Court Order.   The Bankruptcy Court in the Bankruptcy Case shall have approved this Agreement and the Closing of the transaction described herein by the Sale Order and, if applicable, confirmation of a Subchapter V plan.

(f)     Certificate Regarding Resolutions.   Seller shall have delivered to Buyer a certificate, dated as of the Closing Date, executed by an officer or manager of Seller certifying that the resolutions, as attached to such certificate, were duly adopted by the Seller, authorizing and approving the execution of this Agreement and the consummation of the transactions contemplated hereby and that such resolutions remain in full force and effect.

(g)     Closing Certificate.   Seller shall have delivered to Buyer a certificate, dated as of the Closing Date, executed by an officer or manager of Seller, certifying that each of the conditions specified above in Sections 5.1(a), 5.1(b), and 5.1(c) are satisfied in all respects.

7.2     Seller's Obligations.   The obligations of Seller to consummate the transaction contemplated by this Agreement are subject to the satisfaction of each of the following conditions

on or before the Closing Date, unless specifically waived in writing by Seller prior to the Closing Date:

(a)  <u>Representations and Warranties</u>.  The representations and warranties of Buyer contained in this Agreement shall have been true and correct on the date of this Agreement, and shall be true and correct on the Closing Date as through made on and as of the Closing Date.

(b)  <u>Compliance with Covenants</u>.  Buyer shall have duly performed and complied with all covenants, agreements and obligations required by this Agreement to be performed or complied with by it on or prior to the Closing.

(c)  <u>No Injunctions</u>.  No stay, preliminary injunction or other order, injunction, judgment, decision, verdict, decree, ruling, writ, assessment or award of any Governmental Body specifically directed at a particular party and not of general applicability restraining or prohibiting (or which make illegal or enjoins or prevents) the consummation of the transactions contemplated hereby shall be in effect.

(d)  <u>Bankruptcy Court Order</u>.  The Bankruptcy Court in the Bankruptcy Case shall have approved this Agreement and the Closing of the transaction described herein by the Sale Order and, if applicable, confirmation of a Subchapter V plan of reorganization.

(e)  <u>Certificate Regarding Resolutions</u>.  Buyer shall have delivered to Seller a certificate, dated as of the Closing Date, executed by its an officer of Buyer, certifying that the resolutions, as attached to such certificate, were duly adopted by the Buyer, authorizing and approving the execution of this Agreement and the consummation of the transactions contemplated hereby and that such resolutions remain in full force and effect.

(f)  <u>Payment</u>.  Buyer shall have delivered to Seller the Purchase Price.

(g)  <u>Closing Certificate</u>.  Buyer shall have delivered to Seller a certificate, dated as of the Closing Date, executed by an officer or manager of Buyer, certifying that each of the conditions specified above in Sections 7.1(a), 7.1(b), and 7.1(c), are satisfied in all respects.

## ARTICLE 8
## CLOSING

8.1  <u>Closing</u>.  The closing of the sale of the Purchased Assets (the "**<u>Closing</u>**") shall take place following the entry of the final Sale Order and no later than October 31, 2024 (the "**<u>Closing Date</u>**"), and may be performed remotely via scanned copies of the closing documents or at such location and time as the parties hereto may agree in writing. For the purposes of passage of title and risk of loss, allocation of expenses, adjustments and other economic or financial effects of the transactions contemplated hereby, the Closing when completed shall be deemed to have occurred at 11:59 p.m., Mountain Time, on the Closing Date.

8.2  <u>Deliveries by Seller</u>.  At the Closing, Seller shall deliver or cause to be delivered to Buyer the following:

(a)     Bills of Sale and such other instruments of transfer as Buyer may reasonably request to convey and vest in Buyer all of Seller's right, title and interest in and to all of the remaining Purchased Assets. Seller will deliver to Buyer any documentation reasonably required or requested by Buyer to effectuate the intent of the parties to this Agreement, including documentation required by the United States or foreign patent offices (and otherwise consistent with Article 9 of the Uniform Commercial Code) necessary to implement a proper chain of title in their assignment and ownership records.  Following the Closing, Buyer will have the right to immediate possession of Seller's interests in the Purchased Assets.

(b)     Electronic copies of the Books and Records requested by Buyer in accordance with Section 1.2(g), which shall be made no later five days prior to the Closing and shall identify with particularity the Books and Records requested; Buyer's post-Closing access to the Books and Records is set forth in Section 10.2;

(c)      Such other items as are referred in Section 6.1, to the extent applicable.

(d)     All such other items as may be reasonably required by Buyer.

8.3     <u>Deliveries by Buyer</u>.  At the Closing, Buyer shall deliver or cause to be delivered to Seller the following:

(a)     A certificate of Buyer confirming the satisfaction of the conditions set forth in Section 5.2as to representations, warranties and covenants.

(b)     An instrument of assumption of any liabilities to be assumed by Buyer pursuant to Section 1.4.

(c)     The cash portion of the Purchase Price evidenced by a wire transfer of immediately available funds and written confirmation of the satisfaction of debts, claims, and security interests constituting the remainder of the Purchase Price.

(d)     Such other items as are referred in Section 6.2, to the extent applicable.

(e)     All such other items as may be reasonably requested by Seller.


# ARTICLE 9
# TERMINATION AND DAMAGES

9.1     <u>Termination</u>.  Except as herein provided, and subject to the possible required approval of the Bankruptcy Court, this Agreement may be terminated in as set forth below.

(a)     <u>Mutual Consent</u>.  By the mutual written consent of Seller and Buyer;

(b)     <u>Dismissal and Conversion</u>. By any party, if the Bankruptcy Court enters an order dismissing the Bankruptcy Case, appointing a chapter 11 trustee, or converting the Bankruptcy Case into a case under chapter 7 of the Bankruptcy Code prior to entry of a Sale Order;

13

(c)      Breach by Buyer.  By Seller (if Seller is not then in breach of any term of this Agreement), if Buyer shall (i) fail to perform its agreements contained herein required to be performed on or prior to the Closing Date, (ii) breach any of its representations or warranties contained herein, which failure or breach would give rise to a failure of the closing conditions in Articles 6 and 7 hereof and which failure or breach is not cured within five business days after written notice from Seller;

(d)      Breach by Seller.  By Buyer (if Buyer is not then in breach of any term of this Agreement), if Seller shall (i) fail to perform its agreements contained herein required to be performed on or prior to the Closing Date, (ii) breach any of its representations or warranties contained herein, which failure or breach would give rise to a failure of the closing conditions in Articles 6 and 7 hereof and which failure of breach is not cured within five business days after written notice from Seller;

(e)      Failure to Approve.  By either party, in the event that a final Sale Order has not entered by September 30, 2024, or if there shall be any order, writ, injunction or decree of any court or governmental or regulatory agency binding on Seller or Buyer which prohibits or restrains Seller or Buyer from consummating the transactions contemplated hereby; and

In the event of a conflict among this Agreement, and the Sale Order, the Sale Order shall control, followed by this Agreement.

9.2      Effect of Termination.  Termination of this Agreement pursuant to this Article shall terminate all obligations or legal remedies of the parties hereunder except for Sections  10.7, 10.8, and 10.10 to and through 10.18 hereunder.

9.3      Damages.  Notwithstanding anything in this Agreement to the contrary, no party shall be liable to the other for special, incidental, indirect, consequential, special, punitive or exemplary losses, or lost profits or lost opportunity costs.


**ARTICLE 10**
**MISCELLANEOUS**

10.1      Employment of Seller's Employees.  Buyer is solely responsible for employing former Seller employees as Buyer desires to employ and the Closing under this Agreement is not contingent on any such employment.

10.2      Access to Books and Records.  Buyer shall permit Seller reasonable access to and use of the Books and Records for wind down and similar corporate purposes that do not compete with Buyer following the Closing Date for a period of three months.  Such access and use shall be permitted during normal business hours and shall be conducted to minimize disruption to Buyer's post-closing operations.

10.3     Use of Intellectual Property. Seller shall be entitled to use the Intellectual Property for 30 days following Closing in order to wind-up any outstanding operations, change its name, and for any other necessary matters.

10.4     Transfer Taxes.  Any sales or transfer taxes arising from transfer of the Purchased Assets shall be paid by Seller.

10.5     Risk of Loss.

(a)     Risk of Loss and Damage.  The risk of any loss, damage or impairment, confiscation or condemnation of any of the Purchased Assets from any cause whatsoever other than Buyer's fault or negligence shall be borne by Seller at all times prior to the Closing.  In the event of any loss, damage of impairment, confiscation or condemnation of any material items of the Purchased Assets prior to the Closing, Seller shall have the option, but shall not be required, to expend such funds and take such other actions as are necessary to repair, replace or restore such damaged assets (the "**Damaged Assets**") to their prior condition.

(b)     Action by Buyer.  In the event of any material damage or destruction of the Purchased Assets as described above which prevents the operation of the Business in the normal and usual manner, Buyer may terminate this Agreement forthwith without any further obligation hereunder by written notice to Seller.  Alternatively, Buyer may, at its option, proceed to close this Agreement and complete the restoration and replacement of such Damaged Assets after the Closing Date, in which event Seller shall assign to Buyer the right to receive all insurance proceeds payable in connection with such damage to the Damaged Assets and Seller shall have no other obligation to Buyer with respect thereto.

10.6     Further Actions; Assurances.  From time to time, as and when requested by Seller or Buyer, Seller or Buyer, as the case may be, shall execute and deliver, or cause to be executed and delivered, such documents and instruments and shall take, or cause to be taken, such further or other actions as may be reasonably necessary to sell, transfer, assign and deliver to Buyer the Purchased Assets, at Buyer's expense.

10.7     Notices.  All notices and other communications made hereunder shall be in writing and shall be given either by personal delivery, by nationally recognized overnight courier (with charges prepaid) or by email (with confirmation), and shall be deemed to have been given or made when personally delivered, the day following the date deposited with such overnight courier service or when transmitted to an email address, with confirmation of receipt, and addressed to the respective parties at the following addresses (or such other address for a party as shall be specified by like notice):

If to Seller:

Ink! Coffee Corporation
Attn.: Keith Herbert and John Rose
15220 E 6th Avenue, Unit B
Aurora, CO 80011
Phone: (303) 809-0430 and (970) 319-4132

Email: kherbert@inkcoffee.com and jrose@inkcoffee.com

With a copy to:

ONSAGER | FLETCHER | JOHNSON | PALMER LLC
600 17th Street, Suite 425N
Denver, CO 80202
Attention: Andrew D. Johnson and Gabrielle G. Palmer
Phone: 720.457.7061
Email: ajohnson@OFJlaw.com and gpalmer@OFJlaw.com

If to Buyer:

Boria Capital, LLC
Attn.: Chris Leevers, Authorized Representative
500 Wilcox St.
Castle Rock, CO 80104
Phone: 303-522-7695
Email: chris@leevers.com

With a copy to:

Wysocki Law Group P.C.
Attn.: Jeremy S. Wysocki, Esq.
4582 S. Ulster St., Suite 950
Denver, CO 80237
Phone: 303-396-8200
Email: jwysocki@wysocki.law

10.8    Governing Law; Jurisdiction.  This Agreement shall be governed by the laws of the State of Colorado (without giving effect to its conflicts of laws provisions) and the Bankruptcy Code and other related federal laws, to the extent applicable.

10.9    Counterparts/Execution.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Such execution may be by scanned signature or Docusign.

10.10    Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interest or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of all other parties hereto, and any purported assignment without such consent shall be void.

10.11    Headings and Meaning.  The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of this Agreement and shall not in any way affect the meaning or interpretation of this Agreement.  The word "including" as used in this Agreement shall be deemed to mean "including without limitation".

10.12    Amendments and Waivers.  Any waiver, amendment, modification or supplement of or to any term or condition of this Agreement shall be effective only if in writing and signed by all parties hereto, and the parties hereto waive the right to amend the provisions of this section orally.  No waiver by any party hereto of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

10.13    Severability.  In the event that any provision in this Agreement shall be determined to be invalid, illegal or unenforceable in any respect, the remaining provisions of this Agreement shall not be in any way impaired, and the illegal, invalid or unenforceable provision shall be fully severed from this Agreement and there shall be automatically added in lieu thereof a provision as similar in terms and intent to such severed provision as may be legal, valid and enforceable.

10.14    Entire Agreement.  This Agreement, together with the documents and instruments delivered hereto, constitute the entire contract between the parties hereto pertaining to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings between the parties with respect to such subject matter.

10.15    Waiver of Trial by Jury.  **SELLER AND BUYER HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING ARISING UNDER OR WITH RESPECT TO THIS AGREEMENT, OR IN ANY WAY CONNECTED WITH, OR RELATED TO, OR INCIDENTAL TO, THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND IRRESPECTIVE OF WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.  SELLER AND BUYER HEREBY AGREE THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION, OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY.**

10.16    Submission to Jurisdiction; Selection of Forum.  **EACH PARTY HERETO (A) AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTAINED IN OR CONTEMPLATED BY THIS AGREEMENT, WHETHER IN TORT OR CONTRACT OR AT LAW OR IN EQUITY, EXCLUSIVELY IN (I) THE BANKRUPTCY COURT, IF APPLICABLE, (II) THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO OR IN THE EVENT THAT SUCH COURT LACKS SUBJECT MATTER JURISDICTION OVER THE ACTION OR PROCEEDING, (II) IN AN APPROPRIATE STATE COURT LOCATED IN DENVER COUNTY, COLORADO (ONE OF THE ABOVE HEREAFTER REFERRED TO AS THE "CHOSEN COURT") AND (B) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE CHOSEN COURT, (C) WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THE CHOSEN COURT, (D) WAIVES ANY ARGUMENT THAT THE CHOSEN COURT IS AN INCONVENIENT FORUM OR DOES NOT HAVE JURISDICTION OVER ANY PARTY THERETO, AND (E) AGREES THAT**

**SERVICE OR PROCESS UPON ANY PARTY IN ANY SUCH ACTION OR PROCEEDING SHALL BE EFFECTIVE IF NOTICE IS GIVEN IN ACCORDANCE WITH SECTION 10 OF THIS AGREEMENT.**

10.17   <u>Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

10.18   <u>Expenses</u>.  Except as provided in the next sentence, Buyer and Seller shall each bear their own expenses incurred in connection with the transactions contemplated by this Agreement.  Notwithstanding the foregoing, if either party breaches this Agreement, the breaching party shall be responsible for the costs and expenses, including reasonable attorneys' fees, incurred by the other party in enforcing this Agreement against such breaching party by the non-breaching party.

10.19   <u>Survival</u>.  The representations, warranties, indemnities, covenants and agreements of each of the parties hereto shall survive until six (6) months after the Closing, except as set forth in Sections 2.3, 5.1 (first paragraph), 5.2(h), 10.2 -10.4, 10.5(b), 10.6-10.8, 10.11-10.19, which shall survive indefinitely.

*[Signature Page Follows.]*

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase Agreement to be signed by its duly authorized representative as of the date of the last party to sign, as indicated below.

SELLER:

**INK! COFFEE CORPORATION,**
a Colorado corporation

By: Keith Herbert
Name: Keith Herbert
Title: CEO

BUYER:

**BORIA CAPITAL, LLC,**
a Colorado limited liability company

By: Chris Leevers (Aug 28, 2024 07:17 MDT)
Name: Chris Leevers
Title: Manager

## ATTACHED SCHEDULES

| APA Section | Name |
|---|---|
| 1.2(b) | Interests in Real Property |
| 1.2(c) | Purchased Contracts |

## SCHEDULE 1.2(b)
## (INTERESTS IN REAL PROPERTY)

1. Retail Sublease Agreement, dated July 1, 2021, between Recess Campus Lounge Corp., as landlord, and Ink! Coffee Company, as tenant, as amended, for property located at 709 S. University Boulevard, Denver, Colorado.
2. Lease of Retail Space, dated January 9, 2013, between BOP 1801 California Street LLC and BPREP 1801 California Street Owner LLC, as landlord, and Ink! Coffee Company, as tenant, as amended, for property located at 1801 California Street, Denver, Colorado.
3. Lease dated, dated ____ of _____, 2021, between Taubman Cherry Creek Shopping Center LLC, as landlord, and Ink! Coffee Company, as tenant, as amended, for property located at 3000 E. 1st Ave., Denver, CO 80202.
4. Lease, dated September 15, 2021, between National Jewish Health, as landlord, and Ink! Coffee Company, as tenant, as amended, for property located at 1475 Jackson Street, Denver, Colorado.
5. Monthly Recurring Temporary Storage License Agreement – Center Tenant, between Taubman Cherry Creek Shopping Center, L.L.C., as licensor, and Ink! Coffee Company, as licensee, for 559 square feet of storage space located in space #162 at 3000 E. 1st Ave., Denver, CO 80202

**SCHEDULE 1.2(c)**
**(PURCHASED CONTRACTS)**

1. Facility Services Agreement with Cintas Corporation
2. The leases set forth on <u>Schedule 1.2(b)</u>.

**Signature:** _Keith Herbert (Aug 27, 2024 17:08 MDT)_

**Email:** kherbert@inkcoffee.com

# Ink! APA Final 8-27-24

Final Audit Report                                                      2024-08-28

| | |
|---|---|
| Created: | 2024-08-27 |
| By: | Barbara Moss (bmoss@ofjlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA27Hs3MdpXvqoTdrBdtnBHLNvVPWf-BE4 |

## "Ink! APA Final 8-27-24" History

📄 Document created by Barbara Moss (bmoss@ofjlaw.com)
   2024-08-27 - 8:45:07 PM GMT

📧 Document emailed to kherbert@inkcoffee.com for signature
   2024-08-27 - 9:05:52 PM GMT

📄 Email viewed by kherbert@inkcoffee.com
   2024-08-27 - 11:07:24 PM GMT

🖊️ Signer kherbert@inkcoffee.com entered name at signing as Keith Herbert
   2024-08-27 - 11:08:42 PM GMT

🖊️ Document e-signed by Keith Herbert (kherbert@inkcoffee.com)
   Signature Date: 2024-08-27 - 11:08:44 PM GMT - Time Source: server

📧 Document emailed to chrisl@leevers.com for signature
   2024-08-27 - 11:08:46 PM GMT

📄 Email viewed by chrisl@leevers.com
   2024-08-27 - 11:09:09 PM GMT

🖊️ Signer chrisl@leevers.com entered name at signing as Chris Leevers
   2024-08-28 - 1:17:07 PM GMT

🖊️ Document e-signed by Chris Leevers (chrisl@leevers.com)
   Signature Date: 2024-08-28 - 1:17:09 PM GMT - Time Source: server

✅ Agreement completed.
   2024-08-28 - 1:17:09 PM GMT

Adobe Acrobat Sign